59 Cal.Rptr.3d 537 (2007)
150 Cal.App.4th 1511
In re Sandra Davis LAWRENCE, on Habeas Corpus.
No. B190874.
Court of Appeal of California, Second District, Division Seven.
May 22, 2007.
*539 Post-Conviction Justice Project/University of Southern California Law School, Carrie L. Hempel, Michael J. Brennan and Heidi L. Rummel, for Petitioner.
Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, J. Conrad Schroeder, Jennifer A. Neill and Gregory J. Marcot, Deputy Attorneys General, for Respondent.
*538 JOHNSON, J.
This habeas corpus proceeding arises after Governor Schwarzenegger's (Governor) second reversal of a Board of Parole Hearings's (Board) grant of release on parole, decided in 2005. These two reversals were the third and fourth time a Governor has reversed such a grant of parole to this petitioner in the past dozen years. On August 24, 2006, we issued an order to show cause in order to review the Governor's action. Finding the Governor lacked "some evidence" the petitioner's release on parole would represent an "unreasonable risk" of danger to the community under either state or federal constitutional standards, we grant a writ vacating the Governor's reversal and reinstating the Board's 2005 grant of a parole release to petitioner.

1. Lawrence's personal history, the crime and its aftermath.
Sandra Davis Lawrence (Lawrence), an African-American woman, was born and raised in Birmingham, Alabama, the youngest of 12 children. At the time of her birth, her father was 68 and her mother 40.[1] As the youngest child, Lawrence spent much of her teenage years as a nanny for her older siblings' babies and young children while the parents worked or attended college, as well as a caretaker for a mentally retarded sister. After graduation from high school as an average student, Lawrence left Alabama for Chicago where she lived with one of her brothers and his wife. She soon had what was her first serious boyfriend, William Lawrence, got pregnant, married him and later had a second boy. Along the way, her husband took up again with his previous girlfriend. Lawrence finally gave up, and fled with her two young boys to Los Angeles where another married brother and another sister lived.
Lawrence's Los Angeles brother was an established dentist while the sister was Sandra's next youngest sibling, with whom she had always had a contentious and competitive relationship. She took a job as a receptionist in her brother's dental office. Also working for the brother in his dental practice was another dentist, Robert Williams (Mr. Williams), who was married to Rubye Williams (Mrs. Williams). Lawrence *540 and Mr. Williams were soon drawn into a serious affair.
Mr. Williams rented an apartment for Lawrence and provided her with an automobile as well. This relationship started in June 1970 and Mr. Williams was spending nearly half his time with Lawrence, frequently moving into her apartment for days at a time. At some point Mrs. Williams learned of the affair and began pressuring the husband to end it, threatening to take the couple's children and leave him. Mrs. Williams frequently drove to Lawrence's apartment when Mr. Williams was there and left notes on the door and sometimes exchanged vehicles, leaving hers and taking her husband's. There were even three-way, emotional and contentious telephone conversations among the wife, the husband, and the mistress.
Mr. Williams repeatedly told Lawrence he was going to divorce his wife and marry her. But when he failed to follow through with any of these promises, Lawrence finally told Mr. Williams it was over and terminated the relationship in late 1970.
On February 10, 1971, Lawrence was celebrating her 24th birthday at a family party held in her brother's home when Mr. Williams arrived unexpectedly and uninvited. He declared to everyone he Was going to leave his wife and return to Lawrence, if she would have him. Lawrence and Mr. Williams spent the rest of that day and the weekend together, reaffirming their love and making plans for their future together. Mr. Williams was then in the process of opening his own dental office and wanted Lawrence to get a dental assistant certificate and join him in this venture.
Mr. Williams returned to his home Monday morning with the avowed intent of informing his wife he would be seeking a divorce in order to marry Lawrence. However, later that day he called Lawrence and told her he could not go through with it. He could not stand losing his children, and would be staying with his wife. During the conversation, he mentioned Mrs. Williams was at the new dental office waiting for the delivery of some equipment.
Lawrence was enraged at Mr. Williams's betrayal. She eventually explained her state of mind and motivation during therapy with prison psychologists. She took out her anger at Mr. Williams on Mrs. Williams, perceiving her not as a human being but as an obstacle. It was Mrs. Williams whose pressure on Mr. Williams was preventing Lawrence from having a future with him. In a rage, she drove over to the dental office to vent her anger on Mrs. Williams. Anticipating a possible confrontation she took along a potato peeler and also stopped off at her sister's home on the way to pick up a pistol the sister kept under a mattress. There was a struggle in the office, with the two rolling around on the floor, what Lawrence later characterized as a regular "cat fight." Finally, Lawrence pulled out the firearm, fired wildly at Mrs. Williams wounding her in the hand, arm, leg, and neck, and then stabbed her with the potato peeler.
Lawrence returned to her sister's home and replaced the pistol under the mattress, then went to her brother's house and collapsed. A few weeks later, the sister discovered the pistol had been fired. She contacted the police and told them the handgun had been used and it wasn't her or anyone in her household. She also said Lawrence had told family members she had killed Mrs. Williams as a birthday present to herself.
A few weeks after Mrs. Williams's death, Lawrence was in Chicago in connection with an industrial accident lawsuit she had filed in that city. Her family called and told her the FBI said there was a fugitive warrant for her arising from the death of Mrs. Williams. Lawrence flew *541 back to Los Angeles, but during the flight decided she could not turn herself in at that time. So she fled on a bus to Las Vegas. She remained there for three months, supporting herself as a gambler, then used her gambling winnings to move to Puerto Rico where she stayed for three years, earning a living in a real estate agency. Her next stop was New York City where she worked for two years in advertising sales for a local television publication. Then she moved to Pennsylvania where she trained as a cosmetologist. She used that training to work as a hairdresser, cosmetology teacher and later a beauty salon manager.
After three and a half to four years living in Pennsylvania, Lawrence's conscience caught up with her. She decided she should return and turn herself in. So in 1982, some 11 years after the Mrs. Williams homicide, Lawrence returned to Los Angeles, hired an attorney and surrendered to the police. Thereafter, she pled not guilty and suggested the now despised Mr. Williams may have committed the crime.
The case went to trial in 1983. Prior to trial, according to the probation report, Lawrence turned down a plea offer that would have resulted in a two-year prison sentence. When the jury returned a guilty verdict of first degree murder, the trial judge imposed a sentence of seven years to lifethe standard statutory penalty for murders committed before 1978.
The probation report indicated Lawrence had no prior juvenile or adult record, yet recommended the court deny probation based on the seriousness of the current conviction. But the report's evaluation also included the following comments. "Defendant presented herself as an intelligent, articulate, and thoughtful woman who stands convicted of a premeditated murder which occurred 12 and a half years ago. Defendant fled the jurisdiction of the court and has now surrendered herself to the court and has been found guilty by a jury of the crime.... [¶] ... It is undoubtedly true that defendant is not now the same person she was when the crime was committed and it is not expected that defendant would be involved in another similar crime. However, given that defendant has been convicted of first degree murder, probation does not appear to be an appropriate recommendation."[2]

2. Lawrence's prison history and first three positive parole recommendations.
Lawrence received her initial "Psychological Evaluation" in September 1984 while awaiting the results of her appeal from the 1983 conviction. The examining psychologist concluded Lawrence was narcissistic, lacked emotional insight, repressed her emotions and avoided reality through excessive activity. The examining psychologist predicted these characteristics may lead to problems with other inmates and staff. He recommended more altruistic involvement in activities benefiting others. The report also characterized Lawrence as "explosive" and to be a "high flight risk if she loses her appeal."
Lawrence indeed lost her appeal when this division, in an unpublished opinion authored by Justice Leon Thompson, affirmed her conviction on November 14, 1984. Contrary to the prediction, however, she did not escape or attempt to escapenor has she during the ensuing nearly 23 years of confinement.
There is a sharp contrast between that rather negative psychological evaluation in 1984 and Lawrence's next such evaluation some five years later, in October 1989. By that time she was living in Miller A. Honor *542 house, was active as a plumber for the prison and as a tennis coach for other inmates while also having earned a BS in computer science from Laverne University. The examining psychologist gave a positive review of her health, intelligence, and overall psychological condition. While he had found she exhibited some indicia of an "avoidant personality disorder" he also reported that she has "much to offer any community." Most significantly, he found she no longer represented a danger to society.
Because of the conflict between the 1984 and 1989 evaluations, a full battery of tests was ordered. The MMPI revealed Lawrence as being at a borderline between normal and mildly disturbed on the "sociopathic or unstable" scale. The "Thematic Apperception" test revealed fear of aging, a lack of hope and quiet resentment. Her verbal IQ was 101 and her performance IQ was 95 for an overall IQ of 99. In the accompanying interview she admitted the crime but at that point could not remember her motivation. The examiner rated her violence potential as indeterminable, but substantially reduced from the time the murder occurred. The final recommendation was that Lawrence needed further therapy to explore the motive for her crime.
The next psychological assessment in August 1991 recommended intensive psychotherapy based on a finding Lawrence exhibited "features" of three psychological "disorders"borderline personality disorder, antisocial disorder and avoidant personality disorder. In an addendum to this August report dated October 3, 1991, the examining psychologist reported Lawrence had appealed and requested a follow-up interview. She reportedly became angry during the interview, feeling the psychologist had been biased in his appraisals of her psychological condition. The examining psychologist concluded she might be "moderately psychopathic," possessing a narcissistic personality disorder with antisocial features. Nonetheless, he concluded she had made significant progress through psychotherapy and recommended she participate in once a week group therapy sessions.
Only a little over a year later, Lawrence's November 1992 psychological evaluation reflected remarkable improvement. For the first time, the examining psychologist reported Lawrence looked into herself and recognized the monstrous dimension of her crime. She also now comprehended her psychological motivationthat she killed the wife to get back at the husband. This evaluation also involved administration of the same MMPI tests as Lawrence had taken in September 1990. This time, all the results were positive including those that had been negative in the past. The psychologist concluded he would anticipate even further improvement in a less controlled environment. He assessed Lawrence's violence potential at the time of the crime was greater than the average person but now was substantially decreased.
The rather brief 1993 psychological evaluation made similar findings and pointed out Lawrence's only negative reports were a few "128(a)"s for being late to work assignments or classes. The report ended with the appraisal that Lawrence no longer posed a significant threat to public safety should she be released on parole.
On December 28, 1993, over 13 years ago, a unanimous parole Board panel made the first of what has become four positive recommendations to grant a parole to Lawrence. Among the reasons: a finding Lawrence committed the crime as a result of significant stress. Findings she demonstrated motivation and growth and a greater understanding of herself and the crime she committed. A finding there was a reduced probability of recidivism. A finding she exhibited signs of remorse. Findings *543 she has earned a BS in computer science, she was in the initial group of tutors in a program that now has spread to all the state's prisons, and she had remained "disciplinary free" in the decade she had been imprisoned. And, finally, a finding the examining psychologists reported she had made sufficient progress that she no longer represented a significant danger to public safety.
The Board used a matrix applicable to first-degree murderers who committed their crime before 1978. It assigned her the maximum term available under that matrix, based on the great violence involved in the murder she committed combined with her having fled prosecution for over 11 years. This gave her a term of 204 months from which was deducted 40 months for her discipline-free 10 years at the institution. This yielded a net 164 months term (13 years 8 months) before she was eligible for release. Accordingly, the proposed release date was set almost three and a half years in the futureJuly 29,1997.
On March 11, 1994, Governor Pete Wilson reversed the parole Board's recommendation, reciting two reasons. First he argued "public safety" may require a lengthier incarceration. Second, he opined the Board had given inadequate consideration to the "public interest in a punishment proportionate to the seriousness of the crime." The rationale for these findings gave primary credence to the earlier psychological reports and tests reflecting various psychological disorders as opposed to the more recent reports finding no current evidence Lawrence still was subject to those problems. The veto report also stated the base term should be longer (even though the 1970 matrix the parole Board employed was the one the statute required it to use and the base term was the maximum available for pre-1978 first degree murderers).
Lawrence's December 1994 psychological evaluation continued the positive trend of the previous few years. She had made further progress despite the serious disappointment of the Governor's veto of her 1997 release date. The examining psychologist found no psychopathology of any kind at this point. Indeed he found she would not have surrendered back in 1982, if the earlier narcissistic, antisocial or borderline personality disorder diagnoses had been correct. But assuming they had been correct at that time there was no evidence any of those disorders continued in 1994. The psychologist found Lawrence's violence potential outside the institution was that of an average citizen and was greatly decreased from the time she committed the murder of Mrs. Williams some 23 years earlier. He did recommend as a condition of parole she continue psychotherapy and not drink alcohol.
The July 1996 psychological evaluation reported the first glitch in many years, one that turned out to be temporary, however. Lawrence received her very first "disciplinary CDC 115" on January 6, 1996 for allegedly stealing excess food from the kitchen. This troubled the examining psychologist. Nonetheless, he found Lawrence still exhibited no indicia of any psychological disorder. Furthermore, that psychologist stated no drug therapy would be required should Lawrence be released on parole.
A June 1997 evaluation reported the favorable news Lawrence had successfully appealed her CDC from the previous year and thus still had no disciplinary record whatsoever. The psychologist viewed this as a positive and encouraging response to what had been an emotionally frustrating experience for Lawrence. That frustration had been compounded by sorrow because Lawrence's mother had dieda mother who had repeatedly pled for her *544 daughter to be paroled so she could visit the ill and aged parent before her death. Once again, the examining psychologist reported an absence of any psychiatric disorder and further found no evidence of dangerousness outside a controlled setting.
Succeeding psychological evaluations repeated the same pattern. Lawrence no longer needed psychotherapy, even though she desired to continue, because she no longer qualified. That is, she no longer tested as having any psychiatric disorder.
In both 2000 and 2001, Lawrence's parole hearings resulted in split decisions with one commissioner voting against release. This required en banc consideration and each time parole was denied. But 2002 brought a different outcome, the second of the four positive recommendations Lawrence be granted parole.
In a report dated November 8, 2002, by unanimous vote the panel hearing Lawrence's case recommended she receive parole. The reasons given parallel the findings in her favorable recommendation in 1993. This time, however, there was more psychiatric evidence she had taken responsibility for her crime and felt greater remorse and that she would not be a danger to public safety. She also had a much longer record as a model prisoneronly a few credits short of a Masters in Business Administration, membership in the plumbers union, major contributions to a number of educational and public service programs at the prison, and the like. This time there were some minor changes in the computation of her term. The Board calculated 216 months for the aggravated term and 12 more for use of a firearm. However, from this it deducted 64 months in post-conviction credits for a net term of 152 months (12 years 8 months, in contrast to the 13 years 8 months calculated in 1993). Of course, by this time Lawrence already had been imprisoned far longer than 152 monthssome 18 years of an original "seven years to life" sentence. The panel chair concluded the hearing by congratulating Lawrence and telling her, "You've earned it."
On April 7, 2003, Governor Gray Davis reversed Lawrence's second positive parole recommendation.
A little over a year later, on May 18, 2004, another unanimous parole panel recommended granting parole to Lawrence. This time the net term was calculated at 130 months (10 years 9 months). After reciting essentially the same list of findings as in the previous two parole recommendations, the Board highlighted Lawrence had no "115s," that is, disciplinary actions in her nearly two decades at the prison. Although she had received a few "128(a)"s for being late, the last of those had been received a decade earlier in April 1993. An April 5, 2004 psychological evaluation had once again been favorable and reported she was not a danger to public safety and that she understood the seriousness of her crime and what had led to it. The Board did recommend a drug condition requiring counseling and monitoring for a year, although it did not expect a problem but merely wanted to provide assistance to Lawrence during the transition.
A month later Governor Schwarzenegger reversed this third positive parole recommendation. He based this veto on a finding Lawrence's release would represent an unreasonable risk of danger to the public safety. The report stated the murder was a vicious crime committed for an incredibly petty reason and that was "reason enough to pose an unreasonable risk to public safety."

3. The 2005 Board once again recommends Lawrence be granted parole.
On August 25, 2005, a panel of the Board of Parole Hearings filed a 98-page *545 report, incorporating other documents and including a full transcript of the hearing. The panel consisting of Presiding Commissioner Inglee and Deputy Commissioner May unanimously recommended Lawrence be paroled.
The report reflects the panel heard testimony from Lawrence, considered her prison record, read some 24 letters from Lawrence's family and other supporters, studied the full report issued by the Governor in reversing the May 18, 2004 Board recommendation Lawrence be released, and listened to arguments from the District Attorney as well as Lawrence's attorney. The panel commended Lawrence for her resilience after experiencing the disappointment of a gubernatorial veto of her third parole release from imprisonment. It then recites a number of favorable developments since the Governor's action: "a laudatory chrono" from a staff member on the "second watch" stating Lawrence is a "team player who interacts with everyone in a courteous manner." Another chrono shows her continued participation in a conflict transformation program. Still others discuss activities that improve even further her employability, such as participation in Toastmasters, a Women's First Job Fair, etc., as well as religious and charitable work.
Other changes and developments contained in the report include the fact she had obtained her Masters in Business Administration in June, 2005. She also had updated her computer skills and received above average evaluations in her "office services" assignment. The file also contained a letter from a lieutenant on the prison staff commending Lawrence for her work as a physical fitness trainer during the previous five years, stating she is "a superb motivator and trainer." This was accompanied by a letter bearing the signatures of 78 physical fitness trainees praising Lawrence for what she "has done for us in reference to getting some self-esteem, along with some know-how, along with mental strength and physical strength." This letter goes on "to commend her on being just one person that has to deal with hundreds of hundreds of women with different personalities and attitudes ... and still continues to get up each morning and encourage and teach us how to be just as strong ... I truly believe that if a person such as Ms. Lawrence gives so much of herself to so many people, then the least we can do is give something back."
Other letters discussed in the report came from people outside the institution. One from the English instructor in her college program run through the University of LaVerne saying she was a good student. Sister Mary, coordinator of the Partnership for Reentry Program writes: "Ms Lawrence ... is indeed a remarkable woman. She's applied and been accepted into the Archdioceses Partnership for Reentry Program. The Program [lasts] four years, and upon release, where the mentor and team meets with the participant weekly. I am confident of both Sandra's and the team's success in working together." A Sister Agnes adds reassurance Lawrence will have the full support of the Los Angeles Archdioceses Partnership for Reentry if paroled to that county.
The Sisters are backed up by a letter from the Bishop of the Dioceses of San Bernardino, who is a regular visitor to the California Institution for Women. He writes: "I have known Sandra Lawrence for the past number of years. I urge that you would grant Sandra Lawrence release from prison, knowing that she will be a productive member of society if given a chance." This message was echoed in letters from several other outside observers who regularly visit the institution for various *546 purposes and have had the opportunity to know Lawrence.
Notably, no one spoke or wrote in opposition to a grant of parole, with the sole exception of a pro forma argument from the District Attorney. Not the victim's now adult children. Not the victim's husband. Nor any other family or, friend of the victim. Not even a representative of a "victims' rights" organization.
After reviewing all the evidence postdating the Governor's reversal of the 2004 Board recommendationas well as the earlier evidence relevant to her suitabilitythe panel announced its decision orally. The following excerpts from that portion of the hearing capture the panel's findings and its rationale for, once again, recommending Lawrence be released on parole.
"The panel reviewed all information received from the public in relying on the following circumstances in concluding that the prisoner is suitable for parole and would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The prisoner has no juvenile record of assaulting others. While in prison, she [increased her ability] to functioning within the law upon release through the participation of [sic] educational programs, and in this regard she recently completed her Masters of Business Administration, many self-help programs, vocational programs, institutional job assignments and leadership responsibility in positions within the prison. The commitment of the crime was as the result of stress and life, was spurned by a lover in favor of his wife, lack of a significant history of violent crime prior to the instant offense, because of maturation, growth, greater understanding and advancing age has reduced the probability of [recidivism].... (Sic.) [¶] ...
"She has realistic parole plans, which includes a job offer and family support, has maintained close family ties while in prison through letters and visits, has maintained positive institutional behavior which indicates ... that she understands the nature and magnitude of the offense, and accepts responsibility for her criminal behavior and has decided to change towards good citizenship. As other information in this regard ... she completed both her undergraduate and Masters degree in Business Administration while in prison.... I'm going to refer ... to the psychological report of April the 5th, 2004, Peter Hugh, M.D. In that regard, he is supportive. In his April 2004 assessment, Dr. Hugh states:
`The inmate has not demonstrated herself to be dangerous within a controlled setting. I concur with the opinion of Dr. McDaniel as she has demonstrated a tremendous understanding of her early life and result, and the sequence and events that led up to this incarceration. I believe that with passage of time and years and maturity, and her current level of (indiscernible) potential for risk would, be greatly decreased. She has been able to look at her past relationships, understands the type of predatory and pathological men that she has been associated with. Ms. Lawrence is now able to look at her behavior and formulate a number of different options in order to avoid conflict and violence in other settings and situations. She has shown motivation to improving herself, not only through vocational pursuits, but also through self-initiated efforts. I believe that Ms. Lawrence has the resources necessary to become a productive member of society. She has learned to look at motivations behind her behavior and to assess each situation more *547 realistically, and to make informed and thoughtful decisions. I believe she would be able to maintain a strict adherence to rules and regulations that govern our society should she be granted an opportunity for parole.'[3]
"In regard to the setting of terms, we now go to the basic terms of [commitment]. The basic life offense for what's occurred is first degree murder. That is 187 of the Penal Code. The offense occurred on February the 15th, 1971. The term is July from the matrix located in the CC & R title 15 at 2282[b], first degree murder. The offense committed on or before 11/7 of 1978. The panel finds the category IIIC is appropriate. Death resulted from severe trauma.... The victim was stabbed and shot with a firearm three or four times, and that the inmate had little or no relationship with this victim prior to the actual death, other than telephone and letter communications. The panel assessed 192 months as the base offense, and knows that this is the middle term. The panel for the base term gave 192 months, and there is a[24]-month enhancement for the use of firearms, for the total term calculated at 216 months. Post-conviction factors credit from trial date of 1983 to today's date, 8/25, 2005, is a total of 86 months. No time was taken off because the prisoner had no 115 disciplinary actions. So the total period of confinement is 130 months."
After discussing the terms of her parole including requirements she participate in alcohol and drug programs, the panel chair addressed Lawrence directly.
"And I want to tell you that Mr. May and I had a lot of discussion of what you would do in this regard. And we came to this conclusion, and we think it's a good decision. And we wish you a great deal of luck and success in this process that you go through."
Despite the Board's good wishes Lawrence ran out of luck not long after she walked out of the hearing room, as her recommended release moved to the Governor's desk.

4. The Governor reverses the 2005 parole recommendation.
Having reviewed and evaluated the same factors and supporting evidence as the Board, the Governor arrived at the opposite conclusion. He filed a report reversing the recommendation Lawrence be granted release on parole. While the Board's positive recommendation was announced orally, the Governor's reversal appeared in a written report dated January 11, 2006. We include that report in its entirety.
On the morning of February 15, 1971, Sandra Lawrence murdered Rubye Williams by shooting and stabbing her multiple times.
Ms. Lawrence and the victim's husband started an affair several months before the murder. Mrs. Williams knew about the affair and threatened to leave Mr. Williams if he did not break it off. At some point, the affair ended.
On the morning of the murder, Mr. Williams telephoned Ms. Lawrence and mentioned that his wife was at his dental practice waiting for deliveries. After the call, Ms. Lawrence went to her sister's home, let herself inside, and took a gun without permission that was kept under a mattress. Ms. Lawrence then went to Mr. Williams's office. Following a confrontation at the office with the victim, Ms. Lawrence pulled out the gun and began shootingstriking Mrs. Williams in the arm, hand, neck, and leg. *548 As Mrs. Williams lay on the floor, Ms. Lawrence stabbed her multiple times. After leaving the scene, Ms. Lawrence returned the gun to her sister's home and went home to bed. Mrs. Williams's dead body was found by Mr. Williams. Two months later, Ms. Lawrence fled the state. For more than 11 years, she lived in different states and Puerto Rico using various aliases. Although she eventually returned to California and surrendered to authorities, she denied any involvement in Mrs. Williams's murder and instead tried to blame Mr. Williams. Despite her not-guilty plea, she was convicted by a jury of first-degree murder and sentenced to an indeterminate life term in prison. The judgment was affirmed on appeal.
At the time of the murder, Ms. Lawrence was 24 years old and had no previous criminal record. Since her incarceration, while Ms. Lawrence has been counseled eight times for misconduct, including as recently as 2005, she has avoided any disciplinary actions. She also has worked to enhance her ability to function within the law upon release. She has, since my last reversal of the Board's decision to grant Ms. Lawrence parole in 2004, earned a Master's degree in Business Administration. Prior to that, she earned her Bachelor's degree in Human Development and an Associate of Arts degree. She received vocational training in data processing, word processing, and plumbing and has worked within the institutional setting as a library porter, which is her current position, and as a plumber, fitness trainer, and food manager's clerk. Ms. Lawrence has continued to avail herself of self-help and therapy, including Conflict Transformation Skills, Pathways to Wholeness, an array of substance-abuse programs, Stress Management, and Anger Management. She has participated in charitable events, a job fair, Toast-masters, Friends Outside programs, and other activities. Moreover, she has established and maintained seemingly solid relationships with family and others and has made realistic parole plans in Los Angeles for housing in a residential program and employment at a local newspaper. These are all factors supportive of Ms. Lawrence's parole suitability.
But as stated in my 2004 decision, the murder perpetrated by Ms. Lawrence demonstrated a shockingly vicious use of lethality and an exceptionally callous disregard for human suffering because after she shot Mrs. Williamsfour timescausing her to collapse to the floor, Ms. Lawrence stabbed her repeatedly. And the gravity alone of this murder is a sufficient basis on which to conclude presently that Ms. Lawrence's release from prison would pose an unreasonable public-safety risk. She made it a point to arm herself, not with one weapon but with two, and show up at a location where she knew she would find her victim. She told the 2002 Board that she did this because "I always viewed [Mrs. Williams] as the obstacle in my fantasy romance. That she was the one that was keeping me from having what I wanted. So in my mind, it was natural for me to confront her as though she would disappear...." Ms. Lawrence made similar comments to the 2005 Board and said that she saw Mrs. Williams as her "problem." This was a cold, premeditated murder carried out in an especially cruel manner and committed for an incredibly petty reason. According to the appellate decision, Ms. Lawrence told a relative that the killing was a "birthday present" to herself. Ms. Lawrence's birthday was two days before the murder.
Ms. Lawrence was categorized in early prison reports by mental-health evaluators *549 as sociopathic, unstable and moderately psychopathic. Subsequent mental-health evaluations have been more favorable and include low risk assessments. For many years, Ms. Lawrence denied killing Mrs. Williams, but since has admitted that she committed this crime. She says that she fully understands and is sorry for what she did. At the 2004 parole hearing, Ms. Lawrence said that she "wasn't shooting at [the victim]" and she "didn't even know the gun was loaded." She told the 2005 Board that she brought the gun with her for protection, and that she had no intent to physically harm Mrs. Williams when she went, into the dental office. She maintained at the 2005 hearing that, even though she was only two feet from Mrs. Williams when she fired the gun, she did not intend to kill her and stabbing Mrs. Williams afterwards, with the metal peeler that "had about a two-inch blade," was the result of "just [being] in a fit of ragenot to break skin, not to hurt her."
The 2005 Board concluded that the "commitment of the crime was the result of stress and life, was spurned by a lover in favor of his wife...." Regardless of whether this is accurate, there is evidence in the record that any stress under which Ms. Lawrence was operating at the time was not of such level or significance to mitigate her murderous conduct. Ms. Lawrence told the 2005 Board that she "had lost all reasonability" and that after the attack, "I [knew] I had injured Mrs. Williams, and it frightened me to death at that point, that I had injured her and she wasn't moving. I wasn't in a state of mind to know whether she had a pulse or she was still alive. I was in such an emotional state at that point." Yet, as Ms. Lawrence herself admitted to the 2005 Board, she returned the gun to her sister's home, even put it back under the mattress, right after murdering Mrs. Williams. The Commissioner noted the rationality of this behavior. Ms. Lawrence additionally told the 2005 Board about how, just after returning the gun, she proceeded to another sister's home and "went to sleep on her couch" before ultimately fleeing the state.
Ms. Lawrence has been incarcerated nearly 24 years now and has made creditable gains during this time. But after carefully considering the very same factors the Board is required to consider, I find the factors weighing against Ms. Lawrence's parole suitability presently outweigh the positive ones tending to support it. Accordingly, because I continue to believe that her release from prison would pose an unreasonable risk of danger to society, I REVERSE the Board's 2005 decision to grant parole to Ms. Lawrence.
On August 24, 2006, this court considered Lawrence's petition for writ of habeas corpus, and issued an order to show cause. Although we receive such petitions regularly, this is the first time this court has issued an OSC in order to examine a Governor's reversal of a Board grant of parole in such a case.

DISCUSSION

I. STANDARD OF REVIEW.
The California Supreme Court has formulated a standard of review in parole denial cases, a "some evidence" test, based on the due process requirements of the California Constitution. Meantime, the Ninth Circuit has constructed a standard of review in such cases based on the due process clause of the U.S. Constitution. This federal standard applied by district courts in the Ninth Circuit also uses the "some evidence" languagerequiring affirmance of the decision denying parole if that decision is supported by "some evidence." Thus, it is not absolutely clear *550 there indeed are two different standards of reviewa California state standard and a federal standard. But it is clear the Ninth Circuit has added content to the federal test not yet found in the California Supreme Court's elaboration of its "some evidence" standard. Accordingly, we will discuss both and apply each to the Governor's reversal of the Board's recommendation Lawrence be released on parole.

A. Standard of Review Under California Due Process.
In a pair of recent opinions the California Supreme Court has outlined the courts' scope of review under the California Constitution when a Governor overturns a Board's grant of parole to a prisoner serving an indeterminate sentence. Rejecting the Governor's position the courts had no role in reviewing nor power to reverse a Governor's veto of a Board's positive recommendation, in In re Rosenkrantz the Supreme Court held, "[t]o the extent the Governor asserts that the court is not authorized to determine whether the Board's parole decision has a factual basis and thus satisfied the requirements of due process of law, we disagree...."[4] [Constitutional and statutory provisions ... set forth standards and criteria that limit the Governor's review of a parole decision ... and give rise to a protected liberty interest under the California due process clause."[5] "Under California law, this liberty interest underlying a Governor's parole review decisions is protected by due process of law."[6]
But this same decision while granting prisoners judicial review when either a Board or Governor denies them parole, also took away much of the courts' ordinary power when reviewing those determinations. First, the Supreme Court addressed judicial review of a Board's decision. "[W]e conclude that the judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation."[7] Then the Court held, "the courts properly can review a Governor's decisions whether to affirm, modify, or reverse parole decisions by the Board to determine whether they comply with due process of law, and that such review properly can include a determination of whether the factual basis of such a decision is supported by some evidence in the record that was before the Board."[8]
Other than reiterating the "some evidence" standard of review, the Supreme Court's second opinion bearing on the parole approval process for life prisoners, the hotly-contested 4-3 decision of In re Dannenberg,[9] has scant relevance to Lawrence's petition. In essence, it merely held Penal Code section 3041, subdivision (a)[10] in stating the Board "shall normally *551 set a parole release date" [11] when a prisoner approaches her minimum parole eligibility release date did not mean generally or usually or in most cases. Instead the Board can and should first consider under section 3041, subdivision (b)[12] whether a prisoner's commitment crime and/or other past crimes require further delay in setting a release date because of public safety concerns.[13] In Lawrence's case, the Board already has fixed a release date, in fact four of them over the past 13 years. The only issue before this court is whether the Governor validly revoked the most recent of those parole releases voted by the Board.
The California Supreme Court has provided less guidance about the content of the "some evidence" test. It has, however, suggested the "some evidence" must tend to prove the existence of some factor which is relevant to the ultimate finding the statute requires before parole can be denied release of the prisoner on parole would create an unreasonable risk to public safety. Citing to section 3041, subdivision (b), in Rosenkrantz our highest court held, "the governing statute provides that the Board must grant parole unless it determines that public safety requires a lengthier period of incarceration for the individual because of the gravity of the offense underlying the conviction." [14] And in Dannenberg, it held, "the Board may decline to [set fixed release dates] in an individual case if it concludes, on relevant grounds with support in the evidence, that the grant of parole date is premature for reasons of public safety."[15] Later in the Dannenberg opinion, the court further explained, "if the circumstances of a particular murder persuade the Board that the prisoner who committed it is presently too dangerous to grant a fixed parole release date, the Board may deny parole without deciding when the inmate will be released...."[16] "`[T]he Legislature left a "consideration of the public safety" as the *552 fundamental criterion in assessing suitability.'"[17]
When evaluating whether a commitment offense alone can support such a finding, the Supreme Court has supplied some further guidance, focused largely on the nature of that offense. In Rosenkrantz, it explained, "a denial of parole based upon the nature of the offense alone might rise to the level of a due process violationfor example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense.... Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date.' [Citation.]."[18] In Dannenberg's vigorously contested 4-3 decision, the four justice majority took the position the Rosenkrantz formulation, "including our use of the phrase `particularly egregious,' conveyed only that the violence or viciousness of the inmate's crime must be more than minimally necessary to convict him of the offense for which he is confined."[19]
Putting together the elements of the California "some evidence" due process test, the appellate court can uphold the Board or Governor's denial of parole if there is some evidence the prisoner's commitment offense was "more violent and vicious than minimally necessary to convict of that offense" such that it provides "relevant evidence" that "public safety requires a lengthier period of incarceration."

B. Standard of Review Under Federal Due Process.
As noted above, the California Supreme Court expressly based the "some evidence" standard of review exclusively on the due process requirements of the California constitution. Indeed the Court observed, "[b]ecause we conclude as a matter of California law that the `some evidence' standard of review is applicable to judicial review of a Board's decision denying parole, we have no occasion to determine whether the same standard is also mandated under federal constitutional principles."[20] Consequently, there is no California Supreme Court interpretation of the federal due process standard to bind this court when it evaluates a Board or Governor's denial of parole. As a result, we appropriately turn to the federal courts for their construction of the requirements imposed by federal due process when courts review parole decisions.
Both before and after the California Supreme Court's decision in Rosenkrantz, the federal courts in fact have found California's parole determination process also is subject to the U.S. Constitution's due process mandates. While those courts likewise have articulated a "some evidence" standard of review under the federal Constitution, they have provided more and in an important sense different guidance as to the meaning of that concept than is found in the only two California Supreme Court cases to discuss the issue thus far. As it turns out, some of that guidance has special relevance to this *553 court's review of the Governor's reversal of Lawrence's parole in this case.
Two United States Supreme Court decisions, Greenholtz v. Inmates of Nebraska Penal and Correctional Complex[21] decided in 1979 and Board of Pardons v. Allen[22] decided in 1987, held the federal due process clause creates a constitutional liberty interest for convicted persons in certain jurisdictions. The existence of this right depends on whether the state employs "mandatory language" indicating parole will be granted if certain findings are made.[23] In 2002, the Ninth Circuit examined the California parole scheme in McQuillion v. Duncan[24] and found it "uses mandatory language and is largely parallel to the schemes found in Greenholtz and Allen."[25] Accordingly, the McQuillion court found a "liberty interest" was created under the federal Constitution for state prisoners in California.[26]
In 2003, a year after McQuillion, the Ninth Circuit poured some content into this federal constitutional right in the case of Biggs v. Terhune.[27] First, the court held the "liberty interest" protected under the federal Constitution "is created, not upon the grant of a parole date, but upon the incarceration of the inmate."[28] Thus, the liberty interest exists at the time the parole board or Governor determines whether the prisoner is too dangerous to consider setting a parole date. The Biggs court then explained, "In the parole context, the requirements of due process are satisfied if `some evidence' supports the decision."[29] But then the court went on to elaborate on the "some evidence" standard as it applies to parole denials based principally on the nature of the prisoner's commitment offense.
"To insure that a state-created parole scheme serves the public interest purposes of rehabilitation and deterrence, the Parole Board must be cognizant not only of the factors required by state statute to be considered, but also the concepts embodied in the Constitution requiring due process of law. [Citation.]
"The Parole Board's decision is one of `equity' and requires a careful balancing and assessment of the factors considered. [Citation.] As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole.

*554 "We must be ever cognizant that `[d]ue [p]rocess is not a mechanical instrument. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the Constitution entrusted with the unfolding of the process.' [Citation.] A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."[30]
Although the Biggs court affirmed the Board's denial of parole at what was this prisoner's first parole hearing, conducted in 1999 for his 1985 murder conviction, this conviction arose out of the execution-style assassination of a witness scheduled to testify against an illegal enterprise where Biggs was employed.[31] This was a comparatively early parole hearing (only 14 years after the prisoner's conviction) involving a type of murder demonstrating cold calculation, arising out of the prisoner's participation in ongoing criminal activity pursued with an economic motive, and striking at the heart of the justice system. Nonetheless, the court issued the above warning suggesting even a murder of this nature although supplying "some evidence" of a continuing threat to "public safety" justifying a denial of parole at this first hearing, might not be enough evidence of that threat in subsequent parole proceedings.
Several federal district courts in decisions to be discussed later in this opinion have considered parole denials at later stages of prisoners' incarceration and applied the standard of review announced in Biggs. In doing so, those courts frequently have found the nature of the commitment offense alone, essentially no matter how bad the circumstances of that offense, to be less than "some evidence" justifying a denial of parole to the prisoner involved, at least after 15 or more years of incarceration.[32]
Two subsequent Ninth Circuit opinions have reaffirmed the Biggs rationale, although both refused to order release of the petitioner and also suggested a limitation on federal courts when applying the Biggs standard when reviewing state court denials of relief.
The first of these, Sass v. California Board of Prison Terms[33] was decided in August, 2006 considering an appeal from a district court decision[34] denying relief to a prisoner. The district court's denial was based principally on that court's finding the California Supreme Court's Dannenberg opinion meant California's parole scheme no longer created a due process liberty interest in release on parole.[35] The Ninth Circuit quickly reversed this part of the district court's rationale.
"The district court misread Dannenberg. Dannenberg addressed the narrow question whether the Board must engage in a comparative proportionality analysis in setting parole dates pursuant to section 3041(a) before determining whether an inmate is suitable for parole pursuant to section 3041(b). [Citation.] ... [¶] The California court did not hold that section *555 3041(b) does not use mandatory language.... Instead, the court proceeded to the second step of the due process analysiswhether the procedures attendant upon a deprivation were constitutionally sufficient.... The court would not reach this step if it had held that there was no liberty interest. [Citation.] Dannenberg does not explicitly or implicitly hold that there is no constitutionally protected liberty interest in parole."[36]
The Ninth Circuit then turned to the second issue, whether "some evidence" supported the Board's denial of parole at hearings in 1999 and 2000and the California courts' refusals to grant relief from those denials. Sass had been convicted of second degree murder, gross vehicular manslaughter, hit and run death, causing injury while driving under the influence, and felony drunk driving in 1988.[37] So the denials under consideration by the Ninth Circuit occurred 11 and 12 years after the prisoner's conviction. On this issue of existence of "some evidence" justifying denial of parole, one of the three judges dissented, but the majority upheld the Board decisions and the California courts' refusal to intervene.[38]
Unfortunately for proper analysis of the court's rationale on this second issue, the majority opinion is only brief and conclusionary, while the dissent is lengthy and detailed. Based primarily on revelations in the dissent, the apparent reason the majority found "some evidence" supported the Board's denial of parole was Sass's extensive drunk driving record before the fatal crash. He had seven prior DUI convictions (and who knows how many undetected drunk driving incidents) over several years.[39] Where the dissenting judge and the majority apparently differed was over the likelihood the prisoner would return to drinking once released and thus represent a continuing danger to public safety. The dissent placed great weight on Sass's efforts to cure his addiction to alcoholism and also emphasized nothing in the future will reduce the risk of relapse.[40] Thus, the inevitable consequence of the majority's view would be a lifetime in prison for Sass,[41] the very result the Biggs court found would violate the prisoner's due process rights to parole.
The two judges in the majority tipped their hats to Biggs v. Terhune and did not purport to differ with its rationale.[42] Yet, consistent with the conclusionary nature of their opinion the majority failed to distinguish Biggs or explain whether and when in the future the commitment offense and Sass's pre-commitment drunk driving would lose their predictive capacity and thus no longer provide "some evidence" in support of the denial of parole.
The even more recent Ninth Circuit opinion, Irons v. Carey,[43] was authored by the dissenting judge in Sass, yet also denied relief for the prisoner challenging the Board's denial of parole. The court reversed the district court decision which had found a lack of "some evidence" the prisoner's release would represent a present *556 danger to the community.[44] But this Ninth Circuit opinion, unlike Sass, expressly embraced the Biggs rationale and indeed emphasized its denial of relief was only for the time beingindeed predicated only on the fact the prisoner had not yet served the minimum time required for the offense he committed.[45]
The Irons court noted the narrow scope of review allowed federal courts in applying federal due process standards to a denial of parole. "Because Irons filed his petition after the effective date of AEDPA [Antiterrorism and Effective Death Penalty Act of 1996], his petition for habeas corpus may be granted only if he demonstrates that the state court decision denying relief was `contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.' 28 U.S.C. § 2254(d)(1)."[46] Thus, when it *557 came down to determining whether the denial of parole to Irons violated federal due process, the Ninth Circuit felt compelled to invoke the general "some evidence" standard announced by the Supreme Court in Superintendent v. Hill[47] and ask only whether the state court "unreasonably applied" that standard.[48]
The Ninth Circuit panel then responded to Irons's argument invoking Biggs v. Terhune for the proposition the Board could no longer rely on the "immutable factor" of his commitment offense to find him unsuitable for parole. Turning to Sass, the Irons court pointed out, "[although we acknowledged [in Sass ] that Biggs represents the law of this circuit ... we nonetheless held that the Board's reliance on the `gravity' of the ... murder ..., in combination with prior incidents of unlawful conduct, provided a sufficient basis for the Board to deem Sass unsuitable for parole. Because the murder Sass committed was less callous and cruel than the one committed by Irons, ... our decision in Sass precludes us from accepting Iron's [sic] due process argument...."[49]
But after apparently "taking away" from the Biggs interpretation of the federal "some evidence" test, the Irons court "gaveth back"adding further content to that standard of review, suggesting for how long in an inmate's imprisonment a Board or Governor's sole reliance on the commitment offense (and pre-commitment behavior) may still satisfy due process. "We note that in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence. Specifically, in Biggs, Sass, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board. [Citations.] All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms."[50]
As noted earlier, the Ninth Circuit decision in Irons was heavily influenced by constraints imposed on federal courts by the ADPEA, denying them the power to reverse state decisions upholding a board or gubernatorial denial of parole unless they can legitimately find the state court's decision was "`contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'"[51] The ADEPA does not apply to state *558 courts, however. Thus, state courts are free to apply what they discern to be the proper interpretation of federal due process standards in evaluating a governor's reversal of a parole board's recommendation a defendant be released on parole whether the source of the federal standard derives directly from Supreme Court authority or a federal circuit court interpretation of that authority. Moreover, a state court is free to do so even if a federal court could not because of the ADEPA and also even if the federal standard subjects the governor's decision to a somewhat closer and slightly different brand of scrutiny than called for by the state due process standard. To put it another way, as a state "court we can apply the Ninth Circuit's Biggs v. Terhune standard to reverse a board or gubernatorial denial of parole where it is reasonable to do so, while federal courts can only reverse that executive branch decision where it would be unreasonable not to.
Combining the California and federal standards of review, as they have been articulated thus far by the California Supreme Court and the Ninth Circuit, respectively, the commitment crime can lack the power to supply "some evidence" supporting a denial of parole because of the interplay between two factorsthe nature of that crime and the passage of time since its commission. That is, the fact there is "some evidence" the crime was committed and committed a certain way at a certain time does not mean that crime necessarily represents "some evidence" the prisoner's release on parole will pose an unreasonable risk of danger to the public safety at the present time. Whether it possesses the necessary predictive value depends both on the nature of the crime and how long ago it happened.

II. LAWRENCE'S COMMITMENT OFFENSE, NOW OVER 30 YEARS IN THE PAST AND AFTER NEARLY A QUARTER CENTURY OF INCARCERATION, DOES NOT PROVIDE "SOME EVIDENCE" HER PRESENT RELEASE WOULD REPRESENT AN "UNREASONABLE RISK" OF DANGER TO THE COMMUNITY.
As quoted earlier, the Governor's memo justified his reversal of the Board's favorable parole recommendation primarily on the basis of the commitment offense which he characterized as "a shockingly vicious use of lethality and an exceptionally callous disregard for human suffering." The Governor's report further attempted to minimize the Board's finding this murder "was the result of stress ... spurned by a lover in favor of his wife." It argued, "[r]egardless of whether this is accurate ... any stress under which Ms. Lawrence was operating at the time was not of such level or significance to mitigate her murderous conduct." Thus, some 34 years (now 36 years) after the crime and 22 years (now 24 years) into Lawrence's incarceration, the Governor was still relying almost entirely on the nature of the commitment offense to justify Lawrence's continued confinement because "her release from prison would pose an unreasonable risk of danger to society." (As explained later in this opinion, the report's references to other possible factors contribute nothing supporting a rational inference Lawrence's release would unreasonably endanger public safety.)

A. General Considerations.
The main issues before this court are whether "some evidence" supports the Governor's finding the commitment offense is properly characterized as a "shockingly *559 vicious use of lethality and an exceptionally callous disregard for human suffering" and, if so, whether this commitment offense given its nature and the passage of time provides "some evidence" supporting a conclusion the release of Lawrence on parole would represent an "unreasonable risk" of danger to public safety.
Other than rehabilitation, imprisonment of those who are convicted of committing crimes generally serves and is justified by one or more of three societal goals:[52]
(1) retributionthat is, punishment of the offender commensurate with the seriousness of the crime;[53]
(2) deterrence of future offenses by the offender and other potential offenders;[54]
(3) incapacitation of the offender so she is not free to commit other offenses.
When the Legislature sets an indeterminate maximum term with a fixed minimum term, the latter can be viewed as setting the period of imprisonment deemed necessary to satisfy the first two purposes, while the justification for continued imprisonment beyond that fixed minimum depends on the need for continued incapacitation of the offender.[55]
California's sentencing structure in murder cases makes it clear the denial of parole can only be justified by the third of these purposesthe need for further incapacitation of the prisoner. Unless there is an unreasonable risk the parole applicant will re-offend and thus pose a risk to public safety she or he is to be released on parole.[56] Neither the Board nor the Governor properly takes account of whether release on parole will impair the retributive or the deterrent value of continued imprisonment at this late stage of the inmate's incarceration.
*560 The Legislature has made this abundantly clear in Penal Code section 3041, subdivisions (a) and (b) which provide the Board "shall normally set a parole release date ... that will provide uniform terms for offenses of similar gravity and magnitude with respect to their threat to the public"[57] "unless it determines that the gravity of the current or past convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration."[58] As the California Supreme Court emphasized in Dannenberg, a prisoner can be found unsuitable for parole only when there is "some evidence ... [suggesting] he remains a danger to public safety."[59]
But returning to the statutory test, only evidence bearing on the likelihood of recidivism and only to the extent it reveals an "unreasonable risk" of same is relevant to the decision whether to grant or deny parole. As a recent court of appeal opinion emphasized, a parole release decision authorizes the Board (and Governor) only "to identify and weigh the factors relevant to predicting ... `whether the inmate will be able to live in society without committing additional antisocial acts.'"[60]
The factors relevant to that determination are not spelled out in statutes enacted by the Legislature but in regulations promulgated by corrections administrators. Factors those regulations identify as militating against a finding the inmate can be released without an "unreasonable risk of danger to the public safety" include certain characteristics of the commitment offense, e.g., it was committed in an especially heinous, atrocious or cruel manner, or it involved multiple victims, or it was carried out in a dispassionate or calculated manner, or the victim was abused or mutilated, or was killed in a callous disregard of human suffering, or the motive was inexplicable or trivial.[61] Other potential negative factors include an inmate's previous record of violence, or an unstable social history, or commission of sadistic sexual offenses, or a history of severe mental problems related to the crime, or serious misconduct while imprisoned.[62]
The same set of regulations also spells out some factors militating in favor of a finding the inmate can be released without an "unreasonable risk" of danger to the public safety. These include no record of assaultive behavior as a juvenile or adult, a history of stable relationships with others, evidence of remorse, the crime was committed as a result of significant stress (especially if built up over considerable time) or as a result of battered woman's syndrome, no significant history of violent crime, the inmate's age reduces recidivism risk, the inmate has marketable skills or realistic plans for release, and institutional behavior indicating "an enhanced ability to function within the law upon release."[63]
*561 As revealed earlier, as it had three times earlier, the Board found Lawrence's record exhibited all the positive factors listed in the regulations as favoring release on parole, except for the one applicable only to battered spouses. As to the commitment offense itself, the Board found it had been committed while under the stress of an emotional love triangle. It also found none of the other negative factors were present. Lawrence had no criminal record whatsoever, to say nothing of a history of violent crimes or assaultive behavior. Nor was there any suggestion of sadistic sexual acts or an unstable social history. Psychological examinations for the last 15 years uniformly report Lawrence to be sound psychologically and with no severe mental problems. Finally, Lawrence's performance during more than two decades of incarceration has been exemplary, to say nothing of being free of "serious misconduct."
Despite the Board's action and its repeated overwhelmingly positive findingson four occasions spread over more than a decadethe Governor's reversal of its recommendation must be upheld if there is "some evidence" to support his contrary conclusion the parole should be denied. But as explained earlier in discussing the standard of review, it is not just "some evidence" to support the Governor's findings, but "some evidence" sufficient to satisfy the statute's ultimate test, that is, "some evidence" the release of Lawrence would subject society to an "unreasonable risk" of danger to public safety.[64]
As a result, a finding a given murder was committed in an "atrocious" manner, for example, only supports a denial of parole to an otherwise suitable inmate when the atrociousness of the murder was of such a nature it logically leads to the conclusion release of the inmate at the present time would create an "unreasonable risk" of danger to public safety. "The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison."[65]
The fact Lawrence was not a career criminal or a serial or mass murderer or sex offender, nor one who murdered for financial gain, but whose only crime was the murder she committed during a period of emotional stress while still a young woman, combined with the fact she is now entering her sixties, greatly reduces the risk she will be a danger to the public safety if released on parole. But the issue remains whether it can be said there is "some evidence" to support the Governor's contrary conclusion within the state and federal standards of review.

B. Cases Interpreting the State "Some Evidence" Standard.
In recent years, several California appellate courts have applied the state constitution's due process "some evidence" standard as declared by the California Supreme Court in Rosenkrantz and found a commitment murder insufficient to sustain a denial of parole many years or decades later. Meanwhile, several federal district courts have invoked the federal due process "some evidence" standard set forth in Biggs v. Terhune to reverse parole denials, again when based on old commitment offenses. The California Supreme Court expressly *562 limited its own definition of the "some evidence" standard to what the California Constitution and not the U.S. Constitution requires when courts review Board and gubernatorial denials of parole. Accordingly, we are free to consider opinions applying both the federal Biggs standard as well as those applying our own state's Rosenkrantz standard. If the Governor's veto of the Board's grant of parole fails under either of these standards of review, it is subject to reversal.
We turn first to our fellow appellate courts and the commitment offenses they found insufficient to supply "some evidence" to support a denial of parole. In re Smith[66] involved the February, 1985 shooting, beating and drowning of a man who was believed to have sold bad cocaine to a major customer of the prisoner. The prisoner was with several others who were driving with the victim in a limousine, while drinking, using drugs, and visiting night clubs. After an argument between the victim and the unhappy customer, they drove the limo into a canyon area and ordered the victim out. He was chased and eventually murdered. The prisoner was one of those convicted of second degree murder, kidnapping and robbery as a result of this crime, receiving a sentence of 16 years to life.[67]
In 2000, the Board set a parole release date, but the Governor reversed the finding.[68] The trial court found the Governor's reversal was not supported by "some evidence" and granted the writ of habeas corpus which the Governor appealed. The Court of Appeal affirmed in an opinion stressing the many factual errors in the Governor's report.[69]
More significant for purposes of Lawrence's appeal is In re Scott.[70] This case, like the one before our court, involved a love triangle. This time, however, it was the husband who killed his wife's lover.[71] On the day of the murder, July 4, 1986, the wife told her husband she was going to end her relationship with the lover and would return to the husband and their home that night. When she failed to return home, the husband drove to the lover's house, finding the two of them together. He shot the lover in the head and thigh and left the scene. He was convicted later that year of first degree felony murder, the felony being the theft of his wife's purse, but acquitted of premeditated murder.[72] To avoid Scott's appeal on grounds of ineffective assistance of counsel, the prosecutor agreed to a second degree conviction in return for the defendant's waiver of the right to appeal.[73]
In 2004, the Board found Scott did not pose an unreasonable risk of danger to the community and therefore was suitable for parole. The Governor reversed based on the commitment offense which he characterized as "`especially atrocious'" and "`particularly heinous.'"[74] The appellate *563 court rejected this characterization. "[T]he record contains no evidence Scott committed his offense `in an especially heinous, atrocious or cruel manner,' or that the nature of his crime indicates he poses a continuing threat to the public safety if released.... All of the many psychological evaluations of Scott emphasized that he committed his crime while he was experiencing an unusual amount of stress arising from unusual circumstances not likely to recur, and for that reason (as well as his prior crime-free life) there was a low risk he would commit another violent act if released."[75]
The same could be said about Lawrence based on the record in her case. Indeed there are close parallels between the two cases. Lawrence's paramour told her he was leaving his wife then called to say he couldn't do it, because the wife threatened loss of his children. Just like Scott, Lawrence drove over in a rage to confront and eventually kill the person who was keeping her from her lover. Moreover, in both cases, the Governor based his reversal of the parole board's recommended release on the nature of the commitment crime characterizing Scott's as "especially atrocious" and "particularly heinous" while Lawrence's as "a shockingly vicious use of lethality and an exceptionally callous disregard for human suffering."
In In re Lee,[76] a man had sold his restaurant, but the buyer was behind in his payments. In 1987, the seller brought a gun and box of bullets when he came to the restaurant to collect an overdue payment, purportedly intending to kill the buyer and then himself. When the buyer refused to pay, the seller drew the gun and fired five rounds, wounding the buyer but killing the buyer's wife. In 1989, the seller pled guilty to second degree murder and premeditated attempted murder. He was sentenced to 17 years to life for the second degree murder and life with the possibility of parole for the attempted murder. Sixteen years later, in 2005, Lee had his first parole hearing and the Board approved an immediate release, but the Governor reversed the recommendation.[77]
The Court of Appeal reversed the Governor's reversal, summarizing its reasons in the following words. "We must ... view the Governor's two reasons within the context of the other factors he must consider to see if some evidence shows Lee continues to pose an unreasonable risk to public safety. [Citation omitted.] Applying that test, we find no evidence that Lee is likely to commit another crime or that his release would unreasonably endanger the public. Like the Governor, we do not minimize the seriousness of Lee's offenses [now] 19 years ago, for which society has legitimately punished him. No reasonable possibility exists, however, that Lee will re-offend. Other than his offenses here, he has led a crime-free life. The dispute over the restaurant debt that motivated the shootings occurred almost 20 years ago. Weakened by the march of time trod by all mortals, Lee is now 82 years old and in poor health, leaving him to hobble from room to room. The two reasons the Governor citesthe nature of Lee's crimes and recent acceptance of responsibility do not change those facts. We conclude the Governor's reversal of the Board's decision is therefore not supported by some evidence."[78]
*564 Once again, many of the same things could be said about Lawrence. She too has led a crime-free life. The love triangle that motivated the murder she committed is 15 years further in the past than the restaurant debt that motivated Lee and she has been incarcerated several years longer. Although not as old and ill as Lee, she also was much younger when she committed her one and only crime and has moved well into the more stable phase of middle age. Lee's crime, unlike Lawrence's, involved multiple victimsindeed the third person rather than the target is the one who died. This is an objective factor about the commitment crime, in contrast to the subjective characterization about "lethality" and "callousness" the Governor used in Lawrence's case to justify reversal of parole. As was true of Division One in Lee, however, "we do not minimize the seriousness of [Lawrence's] offense" now 36 years ago, "for which society has legitimately punished [her with nearly a quarter century in prison]."[79] Nevertheless, like that court, "we find no evidence that [Lawrence] is likely to commit another crime or that [her] release would unreasonably endanger the public" and "conclude the Governor's reversal of the Board's decision is therefore not supported by some evidence."[80]
In re Weider,[81] "decided in December, 2006, like In re Scott and the case before this court, arose from yet another love triangle. The homicide occurred in the midst of a confusing struggle at a restaurant in February 1987, some two years after the wife left the husband for the other man. As was true of Lawrence in the case before this court, the husband focused his anger on the other person, not the one he loved who had chosen another. That night at the restaurant, the distraught husband had demanded his wife talk with him or he would shoot the other man and himself. He then went to his car and retrieved a handgun. He first fired a couple of errant shots across the restaurant at the fleeing paramour. During an ensuing struggle over the gun, not only did the lover receive fatal wounds, but two other restaurant patrons were wounded.
After a series of parole hearings and court reviews in 2002 through to 2004, the Board held yet another hearing in 2005 and once again denied a release date based on findings the murder was carried out in an especially cruel and callous manner and had multiple victims.[82] The trial court granted Weider's writ but remanded to the Board instructing it to reconsider its decision using only new evidence, having found the grounds used before to be insufficient to support a denial.[83] When the Board appealed, the Court of Appeal affirmed the remand for another hearing although it removed the limitation to new evidence.[84]
In affirming the reversal of the Board's denial, the court made some observations relevant to the case before this court. "[T]he circumstances [in cases upholding the denial of parole based on the commitment offense]rehearsing the murder, executing of a sleeping victim, stalking reflect behavior that reasonably suggests that the inmate could present a danger if released. That is, these cases implicitly acknowledge that the overarching consideration *565 in the suitability determination is whether the inmate is currently a threat to public safety."[85]
Also decided in late 2006, In re Elkins[86] ordered the forthwith release of a prisoner who had been convicted of first degree murder in 1980 receiving a sentence of 25 years to life and whose recommended parole in 2005 had been reversed by the Governor. As is true in Lawrence's case, the primary grounds for the Governor's rejection of the Board's recommendation was the "heinous, atrocious or cruel" nature of the commitment offense.[87]
The victim of Elkins's crime was a friend to whom Elkins, at the time a 19year old drug user, owed money for prior drug purchases.[88] Elkins committed the murder in the course of a robbery by beating the sleeping victim repeatedly with a baseball bat. He then stole money and property from the victim's bedroom, placed the body in a car trunk, drove to an isolated area near Donner Pass and dumped it. He went home and slept for several hours before stealing more of the victim's property from a storage locker and the house of the victim's girl friend. Elkins then fled the state and remained on the run for several months before being captured and returned to California for prosecution. He pled not guilty, but was convicted by a jury of first degree murder and robbery. The judge sentenced him to 25 years to life for the first degree murder and a concurrent sentence on the robbery.[89] Elkins finally revealed the location of the victim's body some 10 months after the murder.[90] By the time it was found, and the victim's relatives received some closure, the body was partially eaten by animals.
In contrast to Lawrence, Elkins did not have a discipline-free prison recordalthough it had been for a long time before the parole hearing.[91] He had two serious violations in the first three years of his commitment, one of which put him in "Max B," an increased custody level, for seven months. There also were claims by other prisoners caught in drug-dealing to the effect Elkins was a "major dealer" within the prison as recently as 1990, but nothing evidently came of those confidential reports. Like Lawrence, Elkins also had a number of minor incidents, primarily being late to assignments, resulting in counseling.
In other respects, Elkins had a very good record of progress while in prison but not nearly as outstanding as Lawrence.[92] While Lawrence earned an AA, BA, and an MBA, in a comparable period of time Elkins only received a GED and was working on his AA. But Elkins had, like Lawrence, participated in a wide array of behavior modification programs including several designed to address the serious drug addiction he suffered during the period he committed the robbery-murder that *566 put him in prison. He also had developed marketable skills, although not as many as Lawrence, and had a viable post-release plan. Age also was a factor cited to the Board in support of Elkins's parole application. At the time of the 2005 Board hearing, Elkins was 47 years old (49 in 2007), while at the time of the hearing considered in this appeal Lawrence was 58 (60 in 2007).
As of 2005, unlike Lawrence, Elkins had been unsuccessful in all his prior parole hearings, 10 in number.[93] But the eleventh time proved the charm, and the Board finally and for the first time recommended his release. By this time, like Lawrence, Elkins was far beyond his minimum eligibility date as computed by the applicable matrix. Thus, release would have been immediate after the waiting period for gubernatorial review expired, had the Governor not reversed the Board's recommendation.
The Governor's report rejecting the Board's recommendation Elkins be released is strongly reminiscent of the one filed in Lawrence's case. In both reports it is stated the prisoner has accepted responsibility and expressed remorse too recently. And, in both reports the commitment offense "alone is sufficient for me to conclude [the prisoner] would pose an unreasonable risk to the public's safety if released from prison at this time."[94]
The Elkins court first found the Governor's report was simply wrong on the facts as to the finding the prisoner's acceptance and remorse came too late to be counted as a factor favoring release on parole.[95] Noting Elkins had first expressed acceptance and remorse over a decade earlier and not just in 2005, the court went on to point out the timing was largely irrelevant. "There is no minimum time requirement. Rather acceptance of responsibility works in favor of release `[no] matter how long-standing or recent it is,' so long as the inmate `genuinely accepts responsibility....' [Citation.] ... There is thus no rational support for the astounding conclusion that Elkins's decade-long acceptance of full responsibility does not even `weigh in favor of his parole.'"[96]
The Elkins court then addressed the single factor militating against parole the Governor found sufficient to reverse the Board's recommendationthe "heinous, atrocious or cruel" nature of the murder. Despite the violence of the actstriking the victim multiple times with a baseball bateven coupled with the robbery motive for the crime, dumping the body down a steep embankment deep in the wilderness, and then fleeing the state to escape responsibility, the court found this commitment crime failed to supply "some evidence" Elkins's release posed "`an unreasonable risk of danger to society.'"[97] It then concluded, "Given the lapse of 26 years and the exemplary rehabilitative gains made by Elkins over that time, continued reliance on these aggravating facts of the crime no longer amount to `some evidence' supporting denial of parole."[98] The Elkins court also observed the case before it "compares favorably to cases affording habeas corpus relief on federal due process grounds,"[99] pointing to the federal *567 district court decisions discussed below,[100] and concluded "[t]he facts of the offense here are older than in any of those ... cases and less or only equally aggravating.... The Governor's decision reversing the Board's grant of parole on the basis of the facts of the offense lacks `some evidence' that granting parole posed `an unreasonable risk of danger to society.'"[101]
The Court of Appeal in the Elkins case took the unusual step of issuing its writ forthwith, ordering the prisoner's immediate release.[102] The California Supreme Court then not only denied review, but also denied supersedeas and a depublication request.[103] If the result and rationale in Elkins are correct, a fortiori, the Governor's reversal of Lawrence's parole release cannot be sustained. Beating a man to death in order to take his property and savings, then hiding the body and fleeing the state is certainly more indicative of a predisposition to reoffend than is a shooting and stabbing during a fit of rage over the loss of a lover. To the extent fleeing the jurisdiction rather than seeking to evade prosecution and conviction in other ways is a negative, continuing to flee until captured as Elkins did is far worse than eventually returning to California and voluntarily turning oneself in to the authorities, as Lawrence did. Furthermore, as to positive factors cited as favoring release, Lawrence is more than a decade older than Elkins and has a discipline-free record in contrast to Elkins's serious misbehavior during the early years of his imprisonment.
As mentioned earlier, the dissent rejects the "some evidence" test applied in the above casesthat the commitment offense must supply "some evidence" supporting a finding the prisoner's release at the present time would represent an "unreasonable risk" of danger to the public safety. Instead, the dissent argues, "some evidence" of one of the factors listed in the regulations as militating against release suffices to justify a Governor's reversal of a recommended release on parole. But as discussed further below, assuming as we do these other appellate courts employed the correct test, the nature of the commitment offenses and other circumstances in those cases provide strong precedent for concluding Lawrence's commitment offense fails to satisfy the California "some evidence" test and thus the Governor's reversal should be reversed.

C. Cases Interpreting the Federal "Some Evidence" Standard.
We turn now to the federal cases interpreting the federal "some evidence" standard framed in Biggs v. Terhune, and find they focus more directly on the age of rather than the nature of the commitment offense.
Our suspicion there may be a difference between the state Constitution's "some evidence" standard and the federal Constitution's "some evidence" standard finds its *568 strongest support in Rosenkrantz v. Marshall[104] decided in 2006. This is the same Rosenkrantz the California Supreme Court decided in 2002 could be denied parole under the California "some evidence" test based solely on the nature of the commitment offense. In ordering Rosenkrantz's release on parole, the federal court relied on Biggs v. Terhune[105] to hold, "While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstancesafter nearly two decades of incarceration and half a dozen parole suitability hearingsviolates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the `some evidence' standard. After nearly 20 years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstance of his or her crime is nil."[106]
Thus, a commitment offense the California Supreme Court had found serious enough to supply "some evidence" under California's constitution to justify a Governor's rejection of parole was found too old to satisfy the federal constitution's "some evidence" test by this federal court.
Martin v. Marshall,[107] another 2006 case, this one in the Northern District, also found an aging commitment conviction fell short of providing "some evidence" sufficient to justify a denial of parole. This case involved a Governor's reversal of a parole release date the Board had recommended. In this one, the petitioner had not only killed one person, but twoand wounded a thirdin 1979.[108] Yet he was only convicted of second degree murder, presumably because the shooting occurred when petitioner was approached in a restaurant by a drug dealer known for violence. Petitioner was a drug user who owed the dealer money not only for drugs but for damage sustained by the dealer's automobile when he had borrowed it. When the dealer reached into his pocket petitioner began firing, killing the dealer but also shooting two innocent bystanders, killing one and wounding the other.
The district court first pointed out the "`some evidence' standard applies equally to the Board's decision and the Governor's review of the grant or denial of parole. [Citation.]"[109] The Martin court discounted the Governor's characterization of the commitment offense as showing a "callous disregard for human life" but relied more directly on the Biggs court's reasoning about why the commitment offense cannot sustain a dangerousness finding forever. "Because petitioner cannot change the past, denying petitioner parole based only on the facts surrounding the crime itself effectively changes his sentence from *569 twenty years-to-life into life imprisonment without the possibility of parole."[110] The judge then used that rationale to question the Governor's reversal of a parole recommendation in this case.
"This case presents a stronger case for release than Biggs for several reasons. First, petitioner's commitment offense was less serious than the petitioner's in Biggs. The Biggs petitioner was involved in a violent, manipulative, and premeditated murder, while petitioner here acted impulsively and, at least in part, in response to the circumstances. [Citation.] Second, the Biggs petitioner had not yet served the full terms of his sentence, while petitioner here has exceeded his sentence by approximately six years. Finally, unlike petitioner here, the petitioner in Biggs had not been granted parole by the original panel hearing his case. Petitioner here has `demonstrate] exemplary behavior and evidence of rehabilitation,' as required by the Biggs court, for a significant period of time. Therefore, the sole reliance on petitioner's commitment offense in denying him parole impinges on petitioner's constitutional liberty interest in parole."[111]

D. Because of the Nature and Age of Lawrence's Commitment Offense, It Does Not Supply "Some Evidence" She is a Present Threat to Public Safety.
We first focus on the report's discussion of factors other than the commitment offense, in which the report principally questions factors the Board cited as favoring release. Then we turn to the nature of Lawrence's commitment offense and whether it supplies "some evidence" rationally establishing her release would pose an unreasonable risk of danger to public safety. And finally, we consider whether that commitment offense has lost whatever predictive value it might have initially possessed because of intervening time and events.

1. Discussion of factors unrelated to the commitment offense in the Governor's report do not contribute "some evidence" Lawrence's release would represent an unreasonable risk to public safety.
Using selected quotes from Lawrence's 2002 and 2005 board hearings, at one point the report suggests Lawrence was not remorseful but was still justifying her murder of Mrs. Williams. Among these selective quotes from the record are the following. "`I always viewed [Mrs. Williams] as the obstacle in my fantasy romance. That she was the one that was keeping me from having what I wanted. So in my mind, it was natural for me to confront her as though she would disappear....' Ms. Lawrence ... [also] said that she saw Mrs. Williams as her `problem.'"
In context, however, it is apparent Lawrence was only explaining her state of mind at the time of the homicide, not justifying it. To the contrary, these and like statements were made in the course of condemning her own behavior on that occasion and expressing deep remorse for what she had done and why she had done it.[112] Furthermore, the 2005 statement *570 was only one in a long line of expressions of remorse Lawrence had made repeatedly and consistently during the decade before the Board's 2005 recommendation she be released on parole. There simply is nothing approaching "some evidence" Lawrence lacked remorse or her remorse was not genuine or came too recently to count. Nor does the Governor's report directly rely on a lack of remorse to justify denial of parole.
In the same vein, the report appears to imply Lawrence had serious psychiatric problems and therefore her release would pose an unreasonable risk of danger to the public. At least, that seems to be the only reason the report recites the negative language found in a couple of her early psychiatric evaluations, language also discussed in the dissent. "Ms. Lawrence was categorized in early prison reports by mental-health evaluators as sociopathic, unstable and moderately psychopathic. Subsequent mental-health evaluations have been more favorable and include low risk assessments."
Those "early reports" of psychiatric conditions, in fact, were over 15 years in the past. The psychologists conducting those evaluations recommended Lawrence should undergo specific forms of therapy which she did for many years. As a result, those unfavorable diagnoses have been erased by a consistent line of psychiatric evaluations finding Lawrence no longer has any psychiatric problems. Indeed for the past several years the annual psychological evaluations have recommended Lawrence no longer participate in therapy of any kind, because she no longer has any psychiatric condition requiring a cure. For the Governor's report to rely in any sense on the early reports Lawrence had one or more psychiatric problems, subsequently cured, as evidence her release would pose a present danger to public safety is the functional equivalent of relying on reports she had pneumonia or tuberculosis when first imprisoned as evidence her release would pose a present danger to public health, even though the disease had been cured long ago while she *571 was in prison. As such, it does not even approach the level of "some evidence" Lawrence would represent an "unreasonable risk" to reoffend if paroled. And once again it is not apparent the report is relying directly on Lawrence's current psychological state as a ground for denying release on parole.
In another ambiguous reference, perhaps calculated to either undercut a positive factor favoring release or to provide an additional negative factor suggesting release would pose a risk to public safety, the report mentions Lawrence has been counseled a number of times. "Since her incarceration, while Ms. Lawrence has been counseled eight times for misconduct, including as recently as 2005, she has avoided any disciplinary actions." But being "counseled" on the average of once every three years supplies no evidence to say nothing of amounting to "some evidence" the release of a prisoner will present an "unreasonable risk" to public safety. Most of these "counseling" sessions arose when Lawrence was late to some class or other appointment. All of them are in the same league with overtime parking tickets or at worst jaywalking in the world outside prison. Unlike the far more serious conduct which can result in disciplinary actions, these minor infractions tell us nothing about the prisoner's predisposition to be a danger to public safety if released on parole.

2. The nature of Lawrence's offense does not supply "some evidence" rationally demonstrating Lawrence's release would unreasonably endanger public safety.
So what we are left with then as the sole possible support for the gubernatorial veto of the Board's recommendation Lawrence be released on parole is Lawrence's commitment offense. Turning to that offense, it is hard to characterize what Lawrence did as more "atrocious," "heinous," "callous," or committed with more "extreme lethality" than most of the other murders described above in which our fellow appellate courts found they failed as "some evidence" supporting a Board or gubernatorial denial of parole. Several of these other murders happened in public places with the murderer shooting in complete disregard of the safety of third persons and indeed sometimes hitting and even killing those third persons. Another involved deliberately and with premeditation beating the victim to death with a baseball bat. The Governor characterized all seven of those murders with the same sort of pejorative terms as was included in the report justifying denial of Lawrence's parole. Yet the appellate courts in those cases did not deem these characterizations satisfied the "some evidence" test.
Lawrence was convicted of first degree murder. Premeditated first degree murders ordinarily are bloody events, unless committed with poison or the like. At the option of the observer, most could be said to be "atrocious, heinous, or callous"or pick your pejorative. And, in the experience of this Division in regularly reviewing parole board and gubernatorial denials of parole to murderers over the past few years, it is seldom either a board or a governor classifies a murder, first or second degree, as less than "atrocious, heinous, or callous" or the equivalent. Indeed they usually add a qualifier such as "extremely" or "vicious" to the description.
The California Supreme Court has clarified California's "some evidence" test in this respect, however. To be used as the primary basis of a denial of parole, a commitment offense must involve more than the minimum elements of that crime.[113] Not every first degree murder *572 can be found to be "atrocious, heinous, or callous" or the equivalent without doing violence to the Supreme Court's articulation of the "some evidence" test.
The evidence in this case may be sufficient to find the defendant intent on killing her victim. Lawrence, after all, was convicted of premeditated first degree murder. On the other hand, it does not reflect a person intent on torturing or otherwise causing unusual suffering to that victim. Other than the bare outline of the crime contained in this court's opinion affirming the conviction and seven years to life sentence, the only evidence in the record concerning what actually happened at the scene of the crime is found in Lawrence's account during parole hearings. This evidence is not disputed in the Governor's report. This evidence is of a rank amateur at physical combat in a full rage and unfamiliar with firearms caught up in a close quarters, life-or-death struggle who eventually fires wildly at her opponent. This account is consistent with the physical evidence of four widely dispersed gun shot wounds, none of them immediately fatal to a hand, an arm, a leg, and the victim's neckand with another bullet completely missing and hitting a wall. The stabbing with the potato peeler added a few additional wounds and some further blood to the scene. It is possible those stab wounds, although necessarily shallow, conceivably may have contributed to the victim's death. According to the elements of the crime the jury found that death was the intended, indeed premeditated, result of the crime Lawrence committed. Nothing suggests those wounds were inflicted to cause Mrs. Williams more pain than required to kill her.
If the Governor's finding of a "shockingly vicious use of lethality" refers to the number of wounds inflicted during the struggle, the evidence suggests it was not something Lawrence intended. Rather the "lethality" resulted from her lack of experience with lethal weapons and the ferocity of the struggle. (With one notable exception, Weider, most of the men who committed the murders described' above were experienced gun owners and did not give their victims the chance to get close enough to disturb their aim. So a single shot or two was generally enough to produce the victim's death.) Similarly, if the Governor's finding Lawrence exhibited an "exceptionally callous disregard for human suffering" suggests she intentionally inflicted more suffering than needed to commit the murder, that finding likewise is inconsistent with the evidence. Once again, any additional suffering accompanying the four bullet wounds and the stab wounds was not intended but rather the product of Lawrence's fury and her ineptitude at the crime of murderhardly a reason for labeling her an especially heinous or dangerous murderess.
But there is a more fundamental problem with the Governor's finding about the nature of Lawrence's crime. Assuming the Governor had "some evidence" sufficient to justify his finding the murder Lawrence committed involved a "shockingly vicious use of lethality" and an "exceptionally callous disregard for human suffering," it is difficult to find Lawrence's commitment crime supplies "some evidence" rationally demonstrating she represents an unreasonable danger to the public safety at the present time. That is, how can it be said her crime is more predictive of future dangerousness than the murders found insufficient for that purpose by our fellow appellate courts in In re Smith, In re Scott, In re Lee, In re Weider, and In re Elkins, nor by Federal district courts in the published decisions, Rosenkrantz v. Marshall and Martin v. Marshall all discussed in more detail above.[114] In those *573 cases, as here, the Board or the Governor labeled the murders in terms similar to the Governor's "shockingly vicious use of lethality" and "exceptionally callous disregard for human suffering" description of Lawrence's commitment crime. Nonetheless, our fellow state appellate courts or federal courts found crimes so described as inadequate to provide the sole or primary "some evidence" of present dangerousness some 15 to 20 years later, at least when in the meantime the prisoner had an exemplary record in prison.
And what of those crimes?
In In re Smith, the prisoner, a drug dealer, was convicted for his role in the shooting, beating, and drowning of another drug dealer some 15 years before the grant of parole the Governor had reversed.[115]
In In re Scott, a wayward wife told her husband she was leaving her lover and returning to the husband, but then didn't show up. In a rage, the husband drove over to the lover's house and shot him in the head with a rifle.[116]
In In re Lee, a man seeking to collect on a business debt brought a gun and a box of bullets along to a meeting and when refused a payment fired five shots, wounding the debtor but killing the debtor's wife.[117]
In In re Weider, another distraught husband took a gun into a public restaurant and fired twice at the man who had been living with his estranged wife for two years but missed, then threatened to kill himself and in the ensuing fracas managed to kill not only the other man, but wound two innocent restaurant patrons, one of them fatally.[118]
In In re Elkins, in order to rob a sleeping friend he owed money for drugs, a 19-year-old addict who was on probation for another offense struck the victim with a baseball bat then pummeled him to death with that bat, drove the body into the wilderness and dumped it down a remote embankment, stole more of the victim's belongings from a storage locker, and fled the state.[119]
In Rosenkrantz v. Marshall, a young man provoked by being "outed" by his brother and a friend acquired an automatic weapon, planned and even rehearsed the shooting for a week before blasting his victim with a fusillade from the gun.[120]
In Martin v. Marshall, a drug user shot his drug dealer whom he owed money, and two other innocent restaurant patrons, killing both the dealer and one of the patrons.[121]
All of the above murders involved at least as "shockingly vicious use of lethality" and "exceptionally callous disregard for human suffering" as did Lawrence's murder of her paramour's wife. Several resulted in the killing or wounding of multiple victims. Several had economic as opposed to emotional motives, and several prisoners were involved in other criminal activities at the time of the offense. Yet state appellate courts or federal courts found these earlier commitment offenses *574 failed to provide "some evidence" of the perpetrator's present dangerousness if released to the outside world.
In earlier denials of positive parole recommendations from the Boards reviewing Lawrence's case, Governors claimed Lawrence's motive for the killing was "trivial." This characterization clearly was not supported by "some evidence" in the record. Rather, the only relevant factor the evidence in the record supports is that Lawrence committed this crime while under emotional stress, a factor favoring a grant of parole. Comparing Lawrence's case to In Re Scott and In re Weider, it is certainly possible to discern a significant "moral" difference between Lawrence's position in the triangleas the non-spouse in a relationship with one of the spouses then killing her lover's spouse, in contrast to one of the spouses killing the other spouse's lover. But when evaluating this not entirely unknown three-party scenario from the perspective relevant to what counts here whether the person committing the murder was in a state of intense emotional stress unlikely to be reproduced in the futurethere is no difference. A paramour, especially one who has reason to expect elevation to the category of a spouse, can be as emotionally out of control as one of the spouses she or he hopes to replace, if threatened with loss of that status. Lawrence found herself in just this position and unfortunately reacted with the same rage and with the same fatal consequences as the husbands in Scott and Weider.
This time the Governor's report sought to diminish the emotional stress factor by suggesting that, if true, it still does not reduce Lawrence's culpability for the murder. But this confuses culpability for a past crime with the predictability of future crimes. There is no doubt Lawrence is culpable for the premeditated murder she committed over three decades ago, despite the emotional stress she was experiencing at the time. But whether the fact Lawrence was under a unique level of stress when she committed that murder reduces the likelihood she would repeat the conduct if released from prison three decades later is a very different question. For the same reason our fellow appellate courts found the emotional context of the murders in several of the cases described aboveand especially In re Scott and In re Weidermeant those murders failed to supply "some evidence" the perpetrators were presently a danger to the community, we conclude Lawrence likewise is no such threat.
The Governor's report, in another somewhat ambiguous statement this time somewhat related to the offense, recounts Lawrence fled the jurisdiction and remained free for 11 years before turning herself in. It is not clear how this makes her a greater risk of reoffending than the many defendants who try to evade prosecution by concealing their guilt and avoiding prosecution in other ways. Except for those found red-handed at the scene, it is rare for murderers to turn themselves in to the authorities. None of the seven prisoners whose parole denials were reversed in the cases described above had done so. Not only did all seven try to avoid prosecution in one way or the other but they, like Lawrence, pled not guilty. And one, Elkins, had fled the state after hiding the victim's body, but was captured a few months later. Lawrence, on the other hand, was in no danger of recapture and safely settled in a state thousands of miles away, yet returned to California and voluntarily surrendered to authorities.
None of this common post-crime but pre-conviction behavior discouraged the courts in the seven cases discussed above from finding the commitment offense an insufficient predictor of future danger to *575 the community. If the commitment offense itself lacks predictive power, certainly the prisoner's initial attempts to evade prosecution also lack such power.

3. Whatever predictive value this commitment offense may have had 35 years ago or 23 years ago has dissipated given Lawrence's exemplary prison record and rehabilitation over the ensuing years.
Shifting attention to the length of the prisoner's confinement and number of parole hearings before the one the court was reviewing, most of the seven cases discussed above involved prisoners who had been imprisoned for a shorter period than Lawrence and only Elkins had gone through as many hearings. One, Martin, had only been incarcerated for 15 years, others 17 or 18 years, and only Elkins had been in prison longer. The court ordered one of these prisoners released after his first parole hearing resulted in a denial and one after the Governor's reversal of the Board's first grant of parole. Only two of these other prisoners had had as many as a half dozen hearings. Meanwhile Lawrence has had nearly a dozen, four of them successful at the Board level but none surviving gubernatorial review.
Thus, if as some of the federal cases hold, the predictive value of the commitment crime dissipates to the point it cannot satisfy the "some evidence" standard 17 to 20 years after its commission, a fortiori it has lost all its predictive steam over a third of a century after it was committed and nearly a quarter century into the prisoner's incarceration. Unlike Biggs, Sass and Irons, Lawrence has served far beyond the "minimum number of years required by her sentence." At the time the Governor reversed the Board's parole recommendation, Lawrence had been imprisoned for 15 years longer (now nearly 17 years longer) than her minimum seven years to life sentence. At that point, she also had been incarcerated for ten years beyond her minimum parole date (now nearly 12 years beyond that date).
None of the seven murderers discussed above, whom courts found warranted release on parole, had a more exemplary record in prison than Lawrence. Only two, like Lawrence, had been discipline-free during their entire term. Indeed several had engaged in some serious misconduct involving drugs or violence, or both, while in prison, although they had been discipline-free for several years before the parole hearing the court was examining. Only one approached Lawrence's educational attainmentsa BS and a Masters degree. None had acquired any more marketable skills than she or had more viable post-release plans. At age 60, she is older than several of these prisoners at the time of the Board or gubernatorial denial of parole was deemed unsupported by "some evidence." Indeed, most were substantially youngerin their forties or early fifties.
Accordingly, whether focusing on the nature of the commitment offense or how much time has elapsed since it occurred, Lawrence is at least as deserving of release as these seven male prisoners whose denials of parole were reversed by California state appellate courts or federal district courts during the past few years. Moreover, entirely independent of any comparisons with other prisoners found to warrant release by other courts, in this case proper application of either the California or federal "some evidence" due process standard requires reversal of the Governor's decision. That decision simply is not supported by some evidence rationally indicating Sandra Davis Lawrence presently represents an unreasonable risk to public safety if released on parole.

*576 DISPOSITION
For all the reasons discussed above, we conclude the Governor's reversal of the Board's fourth recommendation Sandra Davis Lawrence be released on parole is not supported by "some evidence" under either the California or the federal view of what constitutes "some evidence" when courts review parole decisions. Accordingly, we grant the petition for writ of habeas corpus. The Governor's decision to reverse the Board's grant of parole to Sandra Davis Lawrence is vacated, the Board's parole release order is reinstated and it is ordered she be released forthwith.
ZELON, J., concurs.
PERLUSS, P.J., Dissenting.
I respectfully dissent.
Article V, section 8, subdivision (b), of the California Constitution[1] and Penal Code section 3041.2[2] authorize the Governor to review parole decisions made by the Board of Parole Hearings (Board) with respect to individuals sentenced to an indeterminate state prison term based on a conviction for murder. After considering the same factors evaluated by the Board, but weighing them differently, the Governor reversed the Board's decision to grant parole to Sandra Davis Lawrence, concluding she would pose an unreasonable risk of danger to society. As reflected in the disagreement between the Governor and the Board, whether Lawrence is now suitable for parole may be a close question. Whether the Governor's decision not to release Lawrence is devoid of even a modicum of evidence to support it or is otherwise so arbitrary as to offend established notions of due process is not. Applying the "extremely deferential" standard of review mandated by In re Rosenkrantz (2002) 29 Cal.4th 616, 679, 128 Cal.Rptr.2d 104, 59 P.3d 174 (Rosenkrantz), the Governor's determination that Lawrence is not suitable for parole at this time should be upheld. Accordingly, I would deny the petition.

1. The Murder of Rubye Williams: The Commitment Offense

Spurned by her lover, Dr. Robert Williams, who had reneged once again on his promise to leave his wife and marry her, on the morning of February 15, 1971 Lawrence armed herself with a potato peeler with a two-inch blade from her kitchen, drove to her sister's home to retrieve a gun from under a mattress and finally proceeded to Dr. Williams's new dental office where Williams had told Lawrence his wife was waiting alone for deliveries. After a physical confrontation between *577 the two women, Lawrence shot the unarmed Mrs. Williams four times, hitting her in the neck, leg, arm and hand. As Mrs. Williams lay bleeding on the floor, Lawrence repeatedly stabbed her with the potato peeler. Lawrence then left the office (and her victim) and returned the gun to its hiding place at her sister's home. Dr. Williams found his wife's dead body at the dental office.
In reversing the Board's decision to release her on parole, the Governor primarily relied on the nature and circumstances of Lawrence's first degree murder of Mrs. Williams: "[T]he murder perpetrated by Ms. Lawrence demonstrated a shockingly vicious use of lethality and an exceptionally callous disregard for human suffering because after she shot Mrs. Williamsfour timescausing her to collapse to the floor, Ms. Lawrence stabbed her repeatedly.... This was a cold, premeditated murder carried out in an especially cruel manner and committed for an incredibly petty reason."

2. Lawrence's Post-murder Flight and Fugitive Status

Lawrence was not immediately implicated in Mrs. Williams's murder. A short time after the crime, Lawrence left Los Angeles for Chicago, where several members of her extended family lived. While there, one of her siblings informed Lawrence the FBI had issued a fugitive warrant for her arrest. At her parole consideration hearing in August 2005 Lawrence stated, after learning she was wanted for Mrs. Williams's murder, she had intended to return to Los Angeles, but while on the flight from Chicago decided she was not ready to accept responsibility for her crime. When the airplane landed, she immediately boarded a bus for Las Vegas and remained a fugitive for the next 11 years. During that time she lived in several different cities under various assumed names and with related false identity papers (including, it appears, social security numbers and passports).[3]
Lawrence finally returned to California in 1982, met with an attorney and surrendered to the authorities. Lawrence denied any involvement in Mrs. Williams's murder and instead tried to blame Dr. Williams. Testifying on her own behalf at trial in August 1983, Lawrence denied killing Mrs. Williams, insisted she did not want to marry Dr. Williams and asserted it was "no big thing" when he ended their relationship. (People v. Lawrence (1985), 172 Cal. App.3d 1069, 218 Cal.Rptr. 345.) The jury disbelieved Lawrence and convicted her of first degree murder. She was sentenced to an indeterminate state prison term of seven years to life in accordance with the sentencing scheme in effect at the time she committed the murder.[4]
Lawrence's flight from California and her fugitive status for 11 years following the murder of Mrs. Williams, as well as her denial of involvement in the crime *578 when she finally returned to California in 1982, were also identified by the Governor in explaining his reasons for reversing the Board's parole decision.

3. The Early Psychological Assessments of Lawrence as Suffering from Narcissistic Personality Disorder and Being Moderately Psychopathic

`Although observing that more recent mental health evaluations of Lawrence were favorable and included low risk assessments, in reversing the Board's parole decision the Governor noted Lawrence had been identified in early evaluations as "sociopathic, unstable, and moderately psychopathic." Lawrence's initial psychological evaluation for the Board, conducted in September 1984 while her appeal was still pending in this court, indicated "a high degree of repressed hostility that is marginally controlled.... Because emotions are only controlled intellectually, and because that control is marginal, the potential for emotional explosion or severe depression is high unless adjustments are made. Test results indicate that the former is more probable, and emotional problems may be accompanied by violent acting-out behavior." Following several positive assessments, in October 1990 Lawrence was diagnosed with "antisocial personality disorder in partial remission, with remaining narcissistic, histrionic and antisocial personality traits." Her scores on the Minnesota Multiphasic Personality Inventory (MMPI) showed "the typical configuration for a sociopathic or unstable personality but the scores are relatively low and on the dividing line between normal and disturbed." Her potential for violence was "indeterminable at this time." A follow-up psychological assessment in August 1991 noted features of three personality disorders: borderline personality disorder, antisocial personality disorder and avoidant personality disorder. Lawrence wrote a "letter/grievance" after receiving this report and had a second interview with the evaluating psychologist, who described her as "very angry." After further discussion with a colleague, the psychologist prepared an addendum report in which he stated Lawrence met the full criteria for a narcissistic personality disorder, which is characterized, in part, by reacting to criticism with feelings of rage, shame or humiliation. Lawrence was rated on Robert Hare's psychopathy checklist, a commonly used diagnostic tool, and scored as moderately psychopathic. Lawrence declined the invitation to take another MMPI.

4. Evidence Supporting Lawrence's Current Suitability for Parole

The majority opinion accurately recites Lawrence's exemplary record while incarcerated and the many positive factors upon which the Board relied in August 2005 to conclude she was suitable for parole, including the absence of any history of violent crime prior to the murder of Mrs. Williams, Lawrence's current remorse and acceptance of responsibility for her criminal behavior and her maturation, growth, greater understanding and advancing age. As discussed by the Board and my colleagues, and noted by the Governor, Lawrence's more recent psychological evaluations are largely positive. In addition, she has earned bachelor's and master's degrees (in psychology and business administration) while in prison, participated in a wide variety of self-help and vocational programs and capably performed in leadership positions within the prison. Lawrence has realistic parole plans,' has maintained close ties with members of her family and has had no serious prison disciplinary record. In short, there is no doubt that she is a strong candidate for release on parole or that the Board's decision to release her was a reasonable *579 one. But that, of course, is simply not the question we are to address.

5. The Governor's Decision Reflects Due Consideration of the Specified Factors, Is Supported by "Some Evidence" and Is Not Arbitrary or Capricious

a. The standard governing limited judicial review of the Governor's parole decisions: "some evidence related to the specified factors governing parole"

The California Constitution vests the Governor with the power to override parole decisions made by the Board in cases involving convictions for murder. (Cal. Const., art. V, § 8, subd. (b).) The Governor may review decisions of the Board, and affirm, modify or reverse the Board's decision on the "basis of the same factors which the parole authority is required to consider." (Ibid.; Pen.Code, § 3041.2.) Those factors include the nature and circumstances of the commitment offense, which encompasses behavior before, during and after the crime; the prisoner's past and present mental state, including psychological factors related to the crime; and the prisoner's past and present attitude toward the crime. (Cal.Code Regs., tit. 15, § 2281, subds. (b), (c)(1) & (5); see also Pen.Code, § 3041, subd. (b) [Board authorized to determine individual is unsuitable for parole if it determines "the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual"].) Although "the Governor's decision must be based upon the same factors that restrict the Board in rendering its parole decision," (Rosenkrantz, supra, 29 Cal.4th at p. 660, 128 Cal.Rptr.2d 104, 59 P.3d 174), the Governor undertakes an independent, de novo review of the prisoner's suitability for parole. (Ibid)
In Rosenkrantz, supra, 29 Cal.4th at pages 663 to 664, 128 Cal.Rptr.2d 104, 59 P.3d 174, the California Supreme Court held a prisoner granted parole by the Board has a legitimate expectation the Governor's decision to reverse that determination will be based upon the same factors the Board is required to consider, giving rise to a liberty interest protected by the due process clause of the California Constitution. (Cal. Const., art. I, § 7, subd. (a).) "[B]ecause due process of law requires that a decision considering such factors be supported by some evidence in the record, the Governor's decision is subject to judicial review to ensure compliance with this constitutional mandate." (Rosenkrantz, at p. 664, 128 Cal.Rptr.2d 104, 59 P.3d 174.) The Supreme Court repeatedly described the "some evidence" standard as "extremely deferential" (e.g., id. at pp. 665, 679, 128 Cal.Rptr.2d 104, 59 P.3d 174), requiring only a "modicum of evidence" to support the decision (id. at p. 677, 128 Cal.Rptr.2d 104, 59 P.3d 174), and stated judicial review of a Governor's parole decision is limited to a determination whether the decision is "supported by some evidence related to the specified factors governing parole...." (Id. at p. 667, 128 Cal. Rptr.2d 104, 59 P.3d 174; see also id. at p. 670, 128 Cal.Rptr.2d 104, 59 P.3d 174 ["We have determined that the judicial branch properly can review a gubernatorial decision reversing a grant of parole, in order to ascertain whether the decision is supported by some evidence related to the pertinent criteria specified by law"].) "[A] court is authorized to review the factual basis of the Governor's decision only to determine whether it is supported by some evidence relevant to the factors the Governor is required to consider under article V, section 8(b) [of the California Constitution]." (Rosenkrantz, at p. 626.)
*580 The Rosenkrantz Court made plain that the courts were not authorized to review the Governor's weighing of the various factors that indicated suitability or unsuitability for parole, but only to determine whether the factors considered by the Governor in reaching a decision were actually supported by some evidence and whether the Governor had decided the case on an individualized basis: "[T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor, but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision." (Rosenkrantz, supra, 29 Cal.4th at p. 677, 128 Cal.Rptr.2d 104, 59 P.3d 174; accord, In re Elkins (2006) 144 Cal.App.4th 475, 492, 50 Cal.Rptr.3d 503 ["while Elkins argues that the Governor did not give favorable factors enough weight, our `some evidence' scope of review does not allow us to second-guess the Governor's weighting choices"].)[5]

b. Some evidence supports the Governor's primary reliance on the nature and circumstances of the commitment offense to reverse the Board's grant of parole

Although the Governor's statement of reasons for reversing the Board's grant of parole discussed Lawrence's flight from California and 11 years as a fugitive from justice, her denial of any involvement in the murder upon her return to California and her early psychological assessments indicating the possibility of multiple personality disorders, all factors properly considered in evaluating her suitability for parole, the Governor concluded "the gravity alone of this murder is a sufficient basis on which to conclude presently that Ms. Lawrence's release from prison would pose an unreasonable public-safety risk": "[T]he murder perpetrated by Ms. Lawrence demonstrated a shockingly vicious use of lethality and an exceptionally callous disregard for human suffering...." (See generally Rosenkrantz, supra, 29 Cal.4th at p. 682, 128 Cal.Rptr.2d 104, 59 P.3d 174["[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole"]; In re Dannenberg (2005) 34 Cal.4th 1061, 1094, 23 Cal.Rptr.3d 417, 104 P.3d 783 [same] (Dannenberg).)
The majority does not truly dispute that some evidence supports the Governor's characterization of Lawrence's premeditated murder of Mrs. Williams as shockingly vicious or exceptionally callous. Rather, utilizing a variant of the comparative analysis rejected in a related context by Dannenberg, *581 supra, 34 (5al.4th at page 1098, 23 Cal.Rptr.3d 417,104 P.3d 783, the majority simply asserts it is hard to characterize Lawrence's crime as "more `atrocious,' `heinous,' `callous,' or committed with more `extreme lethality' than most of the other murders described" in other appellate decisions discussed by the majority.[6] That, of course, is not the proper question for us to address in deciding whether, in the exercise of extremely deferential review, to overturn the Governor's decision to reverse the Board's grant of parole.[7]
At least implicitly recognizing the disingenuousness of directly challenging the Governor's characterization of the commitment offense on the ground there is not even a modicum of evidence to support it, the majority follows the lead of several recent decisions by Courts of Appeal and asserts the proper question is not whether there is some evidence to support the Governor's findings, but whether, notwithstanding that assessment of the commitment offense, there is some evidence to support the Governor's ultimate conclusion that release of Lawrence would create an unreasonable risk to the public.[8] (See, e.g., In re Lee (2006) 143 Cal.App.4th 1400, 1408, 49 Cal.Rptr.3d 931 ["The test is not whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety. ... Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety"];[9]In re Elkins, supra, 144 Cal.App.4th at p. 502, 50 Cal.Rptr.3d 503 [Governor's decision reversing Board's grant of parole on basis of facts of offense "lacks `some evidence' that granting parole posed `an unreasonable risk of danger to society' [citation]"]; see also In re Weider *582 (2006) 145 Cal.App.4th 570, 589, 52 Cal. Rptr.3d 147 ["these cases [upholding parole denials] implicitly acknowledge that the overarching consideration in the suitability determination is whether the inmate is currently a threat to public safety. [Citations.] Weider's act of simply going out to his car to retrieve the murder weapon does not reflect the type of heinous, atrocious, or cruel behavior described in the foregoing cases and does not rationally indicate that he will present an unreasonable public safety risk if released from prison"].)
However appealing this recasting of the some-evidence standard may be to my colleagues' sense of justice in this particular case, it is squarely at odds with the clear holding of Rosenkrantz, which precludes us from intruding on the Governor's constitutional authority to weigh the specified factors relevant to parole suitability. (Rosenkrantz, supra, 29 Cal.4th at p. 677, 128 Cal.Rptr.2d 104, 59 P.3d 174.) The majority, of course, does not acknowledge that its analysis involves an impermissible reweighing of suitability and unsuitability factors. But if a factor is properly part of the evaluation of a prisoner's suitability for parole, as specified either by statute or by regulation, and if the existence of that factor is supported by some evidence, to hold the same evidence does not support the ultimate conclusion concerning parole suitability is possible only if the court decides the probative (or predicative) value of that factor is outweighed by other indicia of suitability. It is precisely that determination the electorate entrusted to the Governor's discretion, not the courts', when it adopted article V, section 8, subdivision (b), of the California Constitution. (See Rosenkrantz, supra, 29 Cal.4th at p. 667,128 Cal.Rptr.2d 104, 59 P.3d 174 [judicial review of Governor's parole decision limited to determination whether decision is "supported by some evidence related to the specified factors governing parole"].)

c. Ninth Circuit case authority does not justify overturning the Governor's decision

As a corollary to its reformulation of the some-evidence standard, citing obiter dicta from two decisions from the United States Court of Appeals for the Ninth Circuit Biggs v. Terhune (9th Cir.2003) 334 F.3d 910, 916 (Biggs) ("[o]ver time ... should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole") and Irons v. Carey (9th Cir.2007) 479 F.3d 658, 665 (Irons) ("in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process")and several decisions from federal district courts sitting in California, the majority holds the Governor's continued reliance on the nature and circumstances of Lawrence's premeditated murder of Mrs. Williams to deny her parole violates due process.
The United States Supreme Court has held that due process in the context of decisions affecting a prisoner's release date "requires only that there be some evidence to support the findings" made by the prison board (or, by extension, the Governor) and that the decision not otherwise be arbitrary. (Superintendent v. Hill (1985) 472 U.S. 445, 457 [105 S.Ct. 2768, 86 L.Ed.2d 356] [good time credits]; see Jancsek v. Oregon Bd. of Parole (9th Cir. 1987) 833 F.2d 1389, 1390 [parole denial]; Sass v. California Bd. of Prison Terms (9th Cir.2006) 461 F.3d 1123, 1129 ["`[t]he fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact.' [Citation.]"] (Sass).) That is the current *583 state of federal due process law as it related to parole denials. The majority's assertion there is a different or more refined "Biggs v. Terhune standard" that permits courts to reverse the Governor's subjective weighing of the relevant factors relating to parole suitability notwithstanding the existence of some evidence to support the Governor's specific findings does not simply push the envelope of federal due process analysis but leaps far beyond its outer boundary.
In Biggs the Ninth Circuit upheld the Board's determination the petitioner was unsuitable for parole because the commitment offense involved the murder of a witness and was carried out in a manner exhibiting a callous disregard for the life and suffering of another. (Biggs, supra, 334 F.3d at p. 913.) Although upholding the parole denial, the court did caution that continued reliance solely on the gravity of the commitment offense and the petitioner's conduct prior to that offense to deny parole might at some point violate due process: "A continued reliance in the future on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (Id. at p. 917.) Other than speculate that such a situation could exist in the future, however, the court did not purport to give any substantive content to its ruminations.
The lack of any holding or substantive standard in Biggs that purports to authorize a more rigorous judicial scrutiny of parole denials by either the Board or the Governor was emphasized last year in Sass, supra, 461 F.3d 1123, in which the Ninth Circuit rejected a prisoner's claim, based on the speculative dicta in Biggs, that the Board's determination he was unsuitable for parole at his third suitability hearing based on the unchanging factors of his commitment offense violated due process. The court held Sass's prior offenses and the gravity of his commitment offense constitute some evidence to support the Board's decision and emphasized it is not the proper function of the courts "to speculate about how future parole hearings could proceed." (Id. at p. 1129.)
Finally, two months ago in Irons the Ninth Circuit once again upheld the denial of parole (this time reversing the district court's decision to grant the prisoner's petition for habeas corpus) and confirmed the holding of Sass that "denying parole to an individual in reliance on his offense of commitment did not violate due process." (Irons, supra, 479 F.3d at p. 664.) While once again musing that "at some point" and "in some cases" indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his or her rehabilitation, could violate due process, the court emphasized, "All we held in those cases [Biggs and Sass ] and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole...." (Id. at p. 665.)
It is true, as the majority explains, some district courts and federal magistrate judges have relied upon the Biggs dicta to overturn parole unsuitability determinations. Those decisions, however, do not appear to hold that the gravity of the commitment offense has no predicative value in assessing the prisoner's current risk to public safety if released but rather that, because the inmate can never change the historic facts relating to her or his crime, continued reliance on those facts impermissibly transforms the sentence received into life without the possibility of parole.
For example, in Martin v. Marshall (N.D.Cal.2006) 431 F.Supp.2d 1038, the *584 district court granted the petition for writ of habeas corpus challenging the Governor's reversal of the Board's grant of parole to an inmate who had served 26 years in state prison on a 20-years-to-life sentence imposed for second degree murder with a firearm enhancement. The court found the Governor's reasoning in support of his decision "thin to the point of being pretextual" (id. at p. 1049), and held his reliance on petitioner's flight from the scene of the crime without securing medical help and involvement with drugs at the time he committed the crime did not constitute evidence that supported the reversal of the grant of parole. "Because petitioner cannot change the past, denying petitioner parole based only on the facts surrounding the crime itself effectively changes his sentence from twenty years-to-life into life imprisonment without the possibility of parole." (Id. at p. 1046.)
Similarly, in Irons v. Warden of California State PrisonSolano (E.D.Cal.2005) 358 F.Supp.2d 936, a federal magistrate judge, in an opinion adopted by the district court but then reversed by the Ninth Circuit in Irons, supra, 479 F.3d 658, found a due process violation in the denial of parole to the petitioner who had served 16 years of a 17-years-to-life sentence for second degree murder: "[C]ontinuous reliance on unchanging circumstances transforms an offense for which California law provides eligibility for parole into a de facto life imprisonment without the possibility of parole.... Given that no one seriously contends lack of seriousness or lack of triviality at the present time, the potential for parole in this case is remote to the point of non-existence. Petitioner's liberty interest should not be determined by such an arbitrary, remote possibility." (358 F.Supp.2d at p. 947.)
On the other hand, in Singler v. Schwarzenegger (N.D.Cal. April 3, 2007, No. C 06-3373 SI), 2007 WL 1031261, 2007 U.S. Dist. LEXIS 28755, District Judge Susan Illston, after examining the Ninth Circuit's decisions in Biggs, Sass and Irons, explained, "Past criminal conduct is not some arbitrary factor like eye color that has nothing to do with present dangerousness. Recidivism concerns are genuine. [Citation.] California's parole scheme does not offend due process by allowing the [Board] to predict that an inmate presents a present danger based on a murder he committed many years ago." (Id. at *4, at pp. 13-14; see also Mejia v. Kane (N.D.Cal. Jan. 3, 2007, No. C 06-04097 WHA), 2007 WL 30595, 2007 U.S.Dist. LEXIS 3078 ["it is improper to rely on the dicta from Biggs to grant habeas corpus relief.... However wise Biggs' statement was, it is Ninth Circuit dicta without apparent foundation in any United States Supreme Court holding"]; Hill v. Kane (N.D.Cal. Oct. 23, 2006, No. C 06-3203 SI), 2006 WL 3020923, 2006 U.S.Dist. LEXIS 79023 ["the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability"].)
Whatever minimal persuasive value the federal cases cited by the majority may have, they do not justify overturning the Governor's decision and granting Lawrence's petition. To be sure, after confirming that the nature of the commitment offense alone can constitute a sufficient basis for denying parole (Rosenkrantz, supra, 29 Cal.4th at pp. 682, 683, 128 Cal. Rptr.2d 104, 59 P.3d 174 ["the [parole] authority properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant"]), the Supreme Court in Rosenkrantz observed that "[i]n some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violationfor example where no circumstances of the offense reasonably *585 could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense. Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set `in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public....' [Citation.]" (Id. at p. 683, 128 Cal.Rptr.2d 104, 59 P.3d 174; accord, Dannenberg, supra, 34 Cal.4th at pp. 1094-1095, 23 Cal.Rptr.3d 417, 104 P.3d 783.)
For our purposes, what the Rosenkrantz Court did not say in this portion of its opinion is as significant as what it did. In holding the Governor properly considered the circumstances of Rosenkrantz's crime in denying parole, the Court did not in any way suggest that over time the egregious nature of the commitment offense loses all predicative or probative value in assessing the prisoner's suitability for parolea belief that is the lynchpin for the majority's opinion in this caseor endorse the view that continued reliance on the aggravated nature of the crime to evaluate the prisoner's current risk to the public impermissibly interferes with the rehabilitative goals of the prison system. Rather the Court's concern, as it was three years later in Dannenberg, supra, 34 Cal.4th 1061, 23 Cal.Rptr.3d 417, 104 P.3d 783, was to reconcile the general rule requiring uniform terms for offenses of similar gravity (Pen.Code, § 3041, subd. (a)) with the Board's and the Governor's responsibility for case-by-case parole suitability determinations. That balance was achieved by requiring a parole denial based solely on the circumstances surrounding the commitment offense be supported by some evidence suggesting the inmate's crime involved "violence or viciousness ... more than minimally necessary to convict him of the offense for which he is confined" (Dannenberg, at p. 1095, 23 Cal.Rptr.3d 417, 104 P.3d 783) or "particularly egregious acts beyond the minimum necessary to sustain a conviction" for the commitment offense. (Rosenkrantz, supra, 29 Cal.4th at p. 683, 128 Cal.Rptr.2d 104, 59 P.3d 174.)
Pursuant to Rosenkrantz and Dannenberg, therefore, if some evidence supports the Governor's assessment that the prisoner committed the murder in an aggravated manner or that his or her behavior before, during or after the crime was particularly egregiousproper considerations for both the Board and the Governor in determining parole suitabilitya court may not substitute its judgment for the Governor's as to the predicative value of those factors. Whatever law professors or social scientists may say about recidivism rates for murderers (see, e.g., Park, Symposium: Character at the Crossroads (1998) 49 Hastings L.J. 717, 771 ["It is not surprising to find the recidivism rate for convicted murderers to be low, if only because their productivity as murderers is likely to be impaired by age by the time they are released"])and notwithstanding my colleagues' own speculation about which types of murderers are more or less likely to be repeat offenders, logical though their conjecture may beweighing the significance of these factors against others that suggest the prisoner presents a low risk to the public if released on parole is not a judicial function. Nor can we rewrite the parole eligibility statutes and regulations to provide that at some point the nature of the commitment offense may not be considered at all, no matter its predicative value. That is a task for the Legislature.
In my view, the majority violates both of those principles. As described in section 1, above, at least some evidence supports the Governor's characterization of the commitment offense in this case as involving a shockingly vicious use of lethality and an *586 exceptionally callous disregard for human suffering, circumstances beyond the minimum necessary to sustain Lawrence's conviction for first degree murder.[10] In addition, Lawrence's post-crime behavior and attitude toward the offense (her 11 years as a fugitive from justice and subsequent denial of involvement in the murder), cited by the Governor, are also relevant considerations in evaluating her suitability for parole. No more need be shown to uphold the Governor's decision.

d. The Governor's decision to reverse the Board provided the requisite "individualized consideration" to Lawrence's case and was not otherwise arbitrary or capricious

In her petition Lawrence asserts the Governor's indifference to evidence of her significant emotional distress at the time she murdered Mrs. Williams denies her the right to an individualized consideration of all relevant factors. The majority echoes this contention, chastising the Governor for diminishing the significance of the emotional distress factor in the commission of the crime and thereby confusing culpability for a past crime with the predictability of future crimes. These arguments are misplaced. (See Rosenkrantz, supra, 29 Cal.4th at p. 670, 128 Cal. Rptr.2d 104, 59 P.3d 174 ["Although the Governor is required to consider whether the prisoner committed the crime as the result of significant stress in his or her life, the importance attached to this circumstance is left to the judgment of the Governor"].)
Although the Governor in any review of a decision by the Board must consider all available relevant and reliable information in determining suitability for parole, the Governor is required only to provide a written statement specifying his reasons for any reversal or modification of a Board decision. Neither the due process clause nor the governing statutes obligates the Governor to provide a detailed written analysis of each parole suitability factor. (In re Elkins, supra, 144 Cal.App.4th at p. 492, 50 Cal.Rptr.3d 503 ["it does appear that the Governor considered and at least implicitly accepted all of the above favorable factors"]; In re McClendon (2003) 113 Cal.App.4th 315, 323, 6 Cal.Rptr.3d 278; In re Morrall (2002) 102 Cal.App.4th 280, 299-300,125 Cal.Rptr.2d 391.)
When he reversed the Board's grant of parole to Lawrence, the Governor represented he had considered the same factors the Board had considered. There is no reason to conclude he did not in fact do so. Indeed, the Governor's written decision *587 specifically enumerated many of the factors supporting Lawrence's release on parole, including her lack of prior criminal record, her educational accomplishments while incarcerated and her participation in self-help and therapy programs. That the decision did not discuss each of the factors relied upon by the Board in granting parole does not mean the Governor did not review each of the factors or consider all of the evidence. (See In re Elkins, supra, 144 Cal.App.4th at p. 492, 50 Cal.Rptr.3d 503, fn. 4 ["This record does not show a failure to give individual consideration to all factors, and Elkins cites no authority that a Governor's decision must specify in detail every pertinent fact relied upon"]; In re Morrall, supra, 102 Cal.App.4th at p. 300, 125 Cal.Rptr.2d 391 [the Governor "gave Morrall a written statement saying that he had considered the same factors considered by the Board, and he provided a statement of the specific reasons why he disagreed with the Board. Hence, the Governor's failure to discuss favorable information means only that he had no factual disagreement with respect to the Board's assessment of those factors. It does not mean that he failed to consider them"].)
In sum, Lawrence was provided with the requisite procedural rights (see Greenholtz v. Nebraska Penal Inmates (1979) 442 U.S. 1, 12, 99 S.Ct. 2100, 60 L.Ed.2d 668 [inmate must be afforded opportunity to be heard before unbiased decision-maker and informed of reasons for denial of parole]; Jancsek v. Oregon Board of Parole, supra, 833 F.2d at p. 1390 [same]);[11] and the Governor applied controlling legal principles to the facts before him and rendered a decision supported by "some evidence." His decision to reverse the Board's grant of parole is fully consistent with the requirements of procedural due process under both the California and United States Constitutions. (See Dannenberg, supra, 34 Cal.4th at p. 1071, 23 Cal.Rptr.3d 417, 104 P.3d 783.) Accordingly, I would deny Lawrence's petition for writ of habeas corpus.
NOTES
[1] Since the father lived to 110 and the mother into her 90's, Lawrence's birth was not as late in her parents' lives as it might have appeared at the time.
[2] Italics added.
[3] Italics added.
[4] In re Rosenkrantz (2002) 29 Cal.4th 616, 657, 128 Cal.Rptr.2d 104, 59 P.3d 174.
[5] In re Rosenkrantz, supra, 29 Cal.4th at page 660, 128 Cal.Rptr.2d 104, 59 P.3d 174, italics added.
[6] In re Rosenkrantz, supra, 29 Cal.4th at page 661, 128 Cal.Rptr.2d 104, 59 P.3d 174.
[7] In re Rosenkrantz, supra, 29 Cal.4th at page 658, 128 Cal.Rptr.2d 104, 59 P.3d 174, italics added.
[8] In re Rosenkrantz, supra, 29 Cal.4th at page 667, 128 Cal.Rptr.2d 104, 59 P.3d 174, italics added.
[9] In re Dannenberg (2005) 34 Cal.4th 1061, 23 Cal.Rptr.3d 417, 104 P.3d 783.
[10] Further statutory references are to the Penal Code.

Section 3041, subdivision (a) reads in pertinent part:
"One year prior to the inmate's minimum eligible parole release date a panel of two or more commissioners or deputy commissioners shall again meet with the inmate and shall normally set a parole release date as provided in Section 3041.5. No more than one member of the panel shall be a deputy commissioner. In the event of a tie vote, the matter shall be referred for an en banc hearing by the Board. The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. The board shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the inmate was sentenced and other factors in mitigation or aggravation of the crime."
[11] Section 3041, subdivision (a), italics added.
[12] Section 3041, subdivision (b) reads in pertinent part:

"The panel or the board, sitting en banc, shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."
[13] In re Dannenberg, supra, 34 Cal.4th at pages 1087-1088, 23 Cal.Rptr.3d 417, 104 P.3d 783.
[14] In re Rosenkrantz, supra, 29 Cal.4th at page 654, 128 Cal.Rptr.2d 104, 59 P.3d 174, italics added.
[15] In re Dannenberg, supra, 34 Cal.4th at page 1071, 23 Cal.Rptr.3d 417, 104 P.3d 783, italics added.
[16] In re Dannenberg, supra, 34 Cal.4th at page 1080, 23 Cal.Rptr.3d 417, 104 P.3d 783, italics added.
[17] In re Dannenberg, supra, 34 Cal.4th at page 1080, 23 Cal.Rptr.3d 417, 104 P.3d 783, quoting In re Duarte (1983) 143 Cal.App.3d 943, 948, 193 Cal.Rptr. 176, italics added.
[18] In re Rosenkrantz, supra, 29 Cal.4th at page 683, 128 Cal.Rptr.2d 104, 59 P.3d 174, italics added.
[19] In re Dannenberg, supra, 34 Cal.4th at page 1095, 23 Cal.Rptr.3d 417, 104 P.3d 783, italics omitted.
[20] In re Rosenkrantz, supra, 29 Cal.4th at page 658, footnote 12, 128 Cal.Rptr.2d 104, 59 P.3d 174.
[21] Greenholtz v. Inmates of Nebraska Penal and Correctional Complex (1979) 442 U.S. 1, 12, 99 S.Ct. 2100, 60 L.Ed.2d 668.
[22] Board of Pardons v. Allen (1987) 482 U.S. 369, 381, 107 S.Ct. 2415, 96 L.Ed.2d 303.
[23] Board of Pardons v. Allen, supra, 482 U.S. at pages 377-381, 107 S.Ct. 2415.
[24] McQuillion v. Duncan (9th Cir.2002) 306 F.3d 895.
[25] McQuillion v. Duncan, supra, 306 F.3d at page 901.
[26] McQuillion v. Duncan, supra, 306 F.3d at page 901.
[27] Biggs v. Terhune (9th Cir.2003) 334 F.3d 910.
[28] Biggs v. Terhune, supra, 334 F.3d at page 915.
[29] Biggs v. Terhune, supra, 334 F.3d at page 915.
[30] Biggs v. Terhune, supra, 334 F.3d at pages 916-917, italics added.
[31] Biggs v. Terhune, supra, 334 F.3d at page 912.
[32] See cases discussed at pages 46-48, below.
[33] Sass v. California Board of Prison Terms (9th Cir.2006) 461 F.3d 1123.
[34] Sass v. California Board of Prison Terms (2005) 376 F.Supp.2d 975.
[35] Sass v. California Board of Prison Terms, supra, 376 F.Supp.2d at pages 981-983.
[36] Sass v. California Board of Prison Terms, supra, 461 F.3d at pages 1127-1128.
[37] Sass v. California Board of Prison Terms, supra, 461 F.3d at page 1125.
[38] Sass v. California Board of Prison Terms, supra, 461 F.3d at page 1129.
[39] Sass v. California Board of Prison Terms, supra, 461 F.3d at page 1130, footnote 1 (dis. opn. of Reinhardt, J.).
[40] Sass v. California Board of Prison Terms, supra, 461 F.3d at page 1138.
[41] Sass v. California Board of Prison Terms, supra, 461 F.3d at page 1132.
[42] Sass v. California Board of Prison Terms, supra, 461 F.3d at page 1129.
[43] Irons v. Carey (9th Cir.2007) 479 F.3d 658.
[44] In Irons v. Warden of California State Prison-Solano (E.D.Cal.2005) 358 F.Supp.2d 936, 939 a district court judge in the Eastern District (J. Karlton) found a 17-year-old commitment offense insufficient as "some evidence" of the prisoner's continued dangerousness, even though it was coupled with some other pre-conviction criminality. Similar to Lawrence, Irons had both shot and stabbed the victim. (Id. at pages 940-941.) In March 1984, the prisoner and the victim were renting rooms in the same house and the landlords told Irons the victim had stolen some items from them. Irons went to the victim's room and an argument ensued, with the victim denying the alleged thefts. Irons left and retrieved a rifle from his room. He fired 12 rounds into the victim then told him he was going to let him bleed to death. Then he pulled out a knife and stabbed the victim twice in the back, rolled him up into a sleeping bag and locked the room. Ten days later he weighted the sleeping bag, drove the body to a deserted coastal area and threw it into the surf. In 2001, some 17 years after Irons's crime and conviction, the Board denied him a release date, a decision that after being upheld in the California state courts came before the federal courts on a habeas corpus petition. The Board's denial was based on a finding Irons committed the murder in a calculated manner, demonstrated a callous disregard for human life, and for a trivial motive. Furthermore, at the time of the crime Irons was a drug user. (Id. at page 944.) The district court found these factors failed to supply "some evidence" of present dangerousness under the standard of review declared in Biggs, but made a somewhat different point than the judge in Rosenkrantz.

"[I]mportant ... in assessing any due process violation is the fact that continuous reliance on unchanging circumstances transforms an offense for which California law provides eligibility for parole into a de facto life imprisonment without the possibility of parole. The court asks rhetoricallywhat is it about the circumstances of petitioner's crime or motivation which are going to change? The answer is nothing. The circumstances of the crimes will always be what they were, and petitioner's motive for committing them will always be trivial.... Given that no one seriously contends lack of seriousness or lack of triviality at the present time, the potential for parole in this case is remote to the point of non-existence. Petitioner's liberty interest should not be determined by such an arbitrary, remote possibility.
"In the instant case, the [Board] has apparently relied on these unchanging factors at least four prior times in finding petitioner unsuitable for parole. Petitioner has `continue [d] to "demonstrate exemplary behavior and evidence of rehabilitation."' [Citation.] Under these circumstances, the continued reliance on these factors at the 2001 hearing violated due process." (Id. at page 947, footnote omitted.)
[45] Irons v. Carey, supra, 479 F.3d at pages 664-665.
[46] Irons v. Carey, supra, 479 F.3d at pages 661-662. Two of the panel members, Judges Noonan and Reinhardt, were deeply concerned about the constitutionality of the AEDPA's constraints on their review of the state court's decision upholding denial of parole in this case. The court requested supplemental briefing on that issue (Id. at page 665, footnote 5) and Judge Noonan filed a separate concurring opinion, joined by Judge Reinhardt, expressing grave doubts about the AEDPA's constitutionality. The two judges ultimately yielded to a prior decision of the Ninth Circuit holding the Act constitutional, but invited a re-examination of that decision and its rationale. (Id. at pages 667-670.) What is not made explicit in this concurring opinion is whether the result in Irons's case would have been different had the panel been free of the AEDPA's limitations on its review of this particular denial of parole. But there is more than a hint in the concurring opinion's recurring complaint about being confined to considering only that federal law which has been "`clearly established' ... by the Supreme Court." (Id. at pages 666-667.)
[47] Superintendent v. Hill (1985) 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356.
[48] Irons v. Carey, supra, 479 F.3d at page 664.
[49] Irons v. Carey, supra, 479 F.3d at pages 664-665.
[50] Irons v. Carey, supra, 479 F.3d at page 665, italics added.
[51] Irons v. Carey, supra, 479 F.3d at page 662.
[52] For general background on the alternative rationales for incarceration of convicted offenders as discussed in this opinion, see 1 LaFave, Substantive Criminal Law (2d ed.2003), section 1.5, pages 36-47, and authorities cited therein.
[53] This can be viewed as either society's own retribution or society's retribution in behalf of the victim (that is, as a more orderly replacement for personal revenge by the victim or the victim's family). But the same proportionate period of imprisonment can be as easily justified as necessary in order to signify society's concern about the relative seriousness of the crime compared to other criminal acts.
[54] Imprisonment for purposes of deterrence is generally deemed justifiable for as long as the maximum statutory term or for as long as is required to persuade the defendant or others who are rational enough to weigh costs and benefits that they would pay a heavy price in loss of freedom should they be convicted and imprisoned for the crime they might be contemplating.
[55] For purposes of parole, the "fixed minimum" is not necessarily the determinate term specified in the statute in effect at the time the court sentenced the defendantfor example, the seven years in the "seven years to life" sentence Lawrence received. That minimum can be decreased by credits for time served and good conduct in prison. It also can be increased by application of the "matrix" which sets the minimum period before a prisoner is eligible for parole. This matrix takes account of factors demonstrating the crime the prisoner committed was more or less serious than the bare elements of the commitment offense. Thus, the de facto minimum sentence may be far longer (or sometimes shorter) than the statutory minimum embodied in the determinate element of the sentencedepending largely on the prisoner's relative culpability. This was true in Lawrence's case where, as explained earlier (see pages 8, 10 and 14, above) applying the matrix resulted in fixing her minimum release date not at seven years (or seven years minus time earned by good conduct credits) but at over 10 years because of her enhanced culpability given the circumstances of the crime she committed.
[56] Section 3041, subdivisions (a) and (b), quoted in footnotes 10 and 12, above.
[57] Section 3041, subdivision (a).
[58] Section 3041, subdivision (b), italics added.
[59] In re Dannenberg, supra, 34 Cal.4th at page 1098, 23 Cal.Rptr.3d 417, 104 P.3d 783.
[60] In re DeLuna (2005) 126 Cal.App.4th 585, 591, 24 Cal.Rptr.3d 643, quoting In re Rosenkrantz, supra, 29 Cal.4th at page 655, 128 Cal.Rptr.2d 104, 59 P.3d 174, italics added.
[61] California Code of Regulations, title 15, section 2402, subdivision (c)(1).
[62] California Code of Regulations, title 15, section 2402, subdivision (c)(2)-(6).
[63] California Code of Regulations, title 15, section 2402, subdivision (d).
[64] "The test is not whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety." (In re Lee (2006) 143 Cal.App.4th 1400, 1408, 49 Cal.Rptr.3d 931, italics added.)
[65] In re Scott (2005) 133 Cal.App.4th 573, 595, 34 Cal.Rptr.3d 905, italics added.
[66] In re Smith (2003) 109 Cal.App.4th 489, 134 Cal.Rptr.2d 781.
[67] In re Smith, supra, 109 Cal.App.4th at pages 492-493, 134 Cal.Rptr.2d 781
[68] In re Smith, supra, 109 Cal.App.4th at page 492, 134 Cal.Rptr.2d 781.
[69] In re Smith, supra, 109 Cal.App.4th at pages 504-505, 134 Cal.Rptr.2d 781.
[70] In re Scott, supra, 133 Cal.App.4th 573, 34 Cal.Rptr.3d 905.
[71] In re Smith, supra, 109 Cal.App.4th at page 579, 134 Cal.Rptr.2d 781.
[72] In re Smith, supra, 109 Cal.App.4th at page 580, footnote 1, 134 Cal.Rptr.2d 781,
[73] In re Scott, supra, 133 Cal.App.4th at pages 585-587, 34 Cal.Rptr.3d 905.
[74] In re Scott, supra, 133 Cal.App.4th at pages 586, 587, 34 Cal.Rptr.3d 905.
[75] In re Scott, supra, 133 Cal.App.4th at pages 600-601, 34 Cal.Rptr.3d 905.
[76] In re Lee, supra, 143 Cal.App.4th at page 1404, 49 Cal.Rptr.3d 931.
[77] In re Lee, supra, 143 Cal.App.4th at pages 1404-1405, 49 Cal.Rptr.3d 931.
[78] In re Lee, supra, 143 Cal.App.4th at page 1409, 49 Cal.Rptr.3d 931.
[79] In re Lee, supra, 143 Cal.App.4th at page 1409, 49 Cal.Rptr.3d 931.
[80] In re Lee, supra, 143 Cal.App.4th at page 1409, 49 Cal.Rptr.3d 931.
[81] In re Weider (2006) 145 Cal.App.4th 570, 575-576, 52 Cal.Rptr.3d 147.
[82] In re Weider, supra, 145 Cal.App.4th at pages 577-579, 581, 52 Cal.Rptr.3d 147.
[83] In re Weider, supra, 145 Cal.App.4th at pages 582-583, 52 Cal.Rptr.3d 147.
[84] In re Weider, supra, 145 Cal.App.4th at pages 590-591, 52 Cal.Rptr.3d 147.
[85] In re Weider, supra, 145 Cal.App.4th at page 589, 52 Cal.Rptr.3d 147, italics added.
[86] In re Elkins (2006) 144 Cal.App.4th 475, 479-480, 50 Cal.Rptr.3d 503.
[87] In re Elkins, supra, 144 Cal.App.4th at pages 486, 493, 50 Cal.Rptr.3d 503.
[88] In re Elkins, supra, 144 Cal.App.4th at pages 480-481, 50 Cal.Rptr.3d 503.
[89] In re Elkins, supra, 144 Cal.App.4th at page 479, 50 Cal.Rptr.3d 503.
[90] In re Elkins, supra, 144 Cal.App.4th at page 481, 50 Cal.Rptr.3d 503.
[91] In re Elkins, supra, 144 Cal.App.4th at pages 483, 484 and footnote 2, 493, footnote 5, 50 Cal.Rptr.3d 503.
[92] In re Elkins, supra, 144 Cal.App.4th at pages 483-484, 493, footnote 5, 50 Cal. Rptr.3d 503.
[93] In re Elkins, supra, 144 Cal.App.4th at page 480, 50 Cal.Rptr.3d 503.
[94] In re Elkins, supra, 144 Cal.App.4th at page 486, 50 Cal.Rptr.3d 503.
[95] In re Elkins, supra, 144 Cal.App.4th at page 494, 50 Cal.Rptr.3d 503.
[96] In re Elkins, supra, 144 Cal.App.4th at page 495, 50 Cal.Rptr.3d 503.
[97] In re Elkins, supra, 144 Cal.App.4th at pages 496-499, 50 Cal.Rptr.3d 503.
[98] In re Elkins, supra, 144 Cal.App.4th at page 498, 50 Cal.Rptr.3d 503.
[99] In re Elkins, supra, 144 Cal.App.4th at page 500, 50 Cal.Rptr.3d 503.
[100] See pages 46-48, below.
[101] In re Elkins, supra, 144 Cal.App.4th at page 502, 50 Cal.Rptr.3d 503.
[102] "The Governor's decision reversing the Board decision granting Elkins parole is vacated. Elkins's petition for habeas corpus is granted. The Board is ordered to release Elkins forthwith pursuant to the conditions set forth in its decision of March 4, 2005. Considering that release by the Board would have been final on June 30, 2005, over a year ago, and in the interests of justice, this opinion shall be final as to this court immediately." (In re Elkins, supra, 144 Cal.App.4th at p. 503, 50 Cal.Rptr.3d 503.)
[103] In re Elkins, supra, 144 Cal.App.4th 475, 50 Cal.Rptr.3d 503, review denied and depublication request denied February 7, 2007.
[104] Rosenkrantz v. Marshall (C.D.Cal.2006) 444 F.Supp.2d 1063.
[105] Biggs v. Terhune, supra, 334 F.3d 910, discussed at pages 23-25, above.
[106] Rosenkrantz v. Marshall, supra, 444 F.Supp.2d at page 1084. Among other federal and state opinions the judge quoted was an unpublished 2006 district court opinion, Johnson v. Finn (E.D.Cal.2006) 2006 WL 195159, which stated at page 8, footnote 3, "the seriousness of the crime had predictive value for the dangerousness of petitioner's release for the first, second, and perhaps third suitability hearing. But as the years go by, this factor loses its predictive value in light of the growing experience to the contrary (assuming petitioner's record in prison is exemplary)." (Ibid.)
[107] Martin v. Marshall (N.D.Cal.2006) 431 F.Supp.2d 1038, 1048.
[108] Martin v. Marshall, supra, 431 F.Supp.2d at page 1040.
[109] Martin v. Marshall, supra, 431 F.Supp.2d at page 1043.
[110] Martin v. Marshall, supra, 431 F.Supp.2d at page 1046.
[111] Martin v. Marshall, supra, 431 F.Supp.2d at page 1047.
[112] At the 2005 hearing, after discussing the commission of the crime and her flight from prosecution two months later, Lawrence was asked if there was anything else she had to say about the crime itself. She responded: "I would like to let you know, you know, that I'm totally, totally aware of what I did. I take full responsibility for what I did.... And I made that first step back into reality to come and let you know that I do understand that I did something horrible, and I'm willing to suffer the consequences for what I did. And I lived here for 21 1/2 years suffering those consequences, and have grown and gotten stronger behind it. So I come to you today, apologizing as I do on a daily basis when it comes up in my mindapologize to Ruby [sic] Williams, knowing that I took her life. She was not my victim. She was the object of my rage. She was the object of my disgust with everything that had happened to my life, and my unfulfillment in my life up to that point. And it was an irrational act that I committed against her, her family, and that thatthat stone knife that I threw in that river that morning, how it affected so many people. I understand that. And I have stood strong here for 21 years letting everyone know that I was willing to make a change, and I worked every day to make a change and to let anybody and everybody know that nothing like that could happen in my life again, and anybody's life that comes within my contact, because my life is an open book where anybody could see how they can involved [sic] in situations that leads to much damage to people and society. So I just want to apologize to Ruby [sic] and her children for doing that to her, as well as to my children and my family, and to the community at large. I can't take it back. All I've done is try to work to improve myself and improve my surroundings. And that's all I can do today."

Later in the hearing, in answer to the question why she took out her rage on Mrs. Williams instead of Mr. Williams, who had chosen to stay with his wife, Lawrence explained: "Because women blame women when not getting what they want. They don't blame men. And a 24-year-old distraught, betrayed woman looked for the easiest probably person to take out any frustration on. I wanted him, so in my 24-year-old mine [sic ], she was my problemhe wasn't my problem. So it's irrational, it's unfounded, it's unfair, and I understand that now. She was not the person to blame for my rage. I just took it out on her because it wasit was just probably the easiest thing to do to confront her instead of Robert."
[113] In re Rosenkrantz, supra, 29 Cal.4th at page 683, 128 Cal.Rptr.2d 104, 59 P.3d 174.
[114] See pages 561-569, above.
[115] In re Smith, supra, 109 Cal.App.4th at pages 492-493, 134 Cal.Rptr.2d 781.
[116] In re Scott, supra, 133 Cal.App.4th at page 579, 34 Cal.Rptr.3d 905.
[117] In re Lee, supra, 143 Cal.App.4th at page 1404, 49 Cal.Rptr.3d 931.
[118] In re Weider, supra, 145 Cal.App.4th at pages 575-576, 52 Cal.Rptr.3d 147.
[119] In re Elkins, supra, 144 Cal.App.4th at pages 480-481, 50 Cal.Rptr.3d 503.
[120] Rosenkrantz v. Marshall, supra, 444 F.Supp.2d at page 1065; In re Rosenkrantz, supra, 29 Cal.4th at pages 627-629, 128 Cal. Rptr.2d 104, 59 P.3d 174.
[121] Martin v. Marshall, supra, 431 F.Supp.2d at page 1040.
[1] Article V, section 8, subdivision (b), of the California Constitution provides, "No decision of the parole authority of this State with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider. The Governor shall report to the Legislature each parole decision affirmed, modified, or reversed, stating the pertinent facts and reasons for the action."
[2] Penal Code section 3041.2 provides, "(a) During the 30 days following the granting, denial, revocation, or suspension by a parole authority of the parole of a person sentenced to an indeterminate prison term based upon a conviction of murder, the Governor, when reviewing the authority's decision pursuant to subdivision (b) of Section 8 of Article V of the Constitution, shall review materials provided by the parole authority. [¶] (b) If the Governor decides to reverse or modify a parole decision of a parole authority pursuant to subdivision (b) of Section 8 of Article V of the Constitution, he or she shall send a written statement to the inmate specifying the reasons for his or her decision."
[3] According to information contained in one of Lawrence's early psychological assessments, while a fugitive, Lawrence was arrested for her role in a financial scam, but escaped after being apprehended and relocated to another city under a new assumed identity. Lawrence also acknowledged she periodically experimented with cocaine and other controlled substances during the 11 years she lived as a fugitive. Although neither these offenses nor the other crimes potentially committed by Lawrence to obtain false government identification documents during her fugitive years should have any significant impact on the evaluation of Lawrence's current suitability for parole, they do belie Lawrence's suggestion that her conduct during this period was "crime free" and thus supports her release on parole.
[4] By way of comparison, the penalty today for an individual with no prior felony convictions who commits first degree murder by using a firearm is 50 years to life. (Pen.Code, §§ 190, subd. (a), 12022.53, subd. (d).)
[5] Although Rosenkrantz itself left the issue open (Rosenkrantz, supra, 29 Cal.4th at p. 658, fn. 12, 128 Cal.Rptr.2d 104, 59 P.3d 174), the same "some evidence" standard governs any due process analysis under federal constitutional principles. (In re Dannenberg (2005) 34 Cal.4th 1061, 1098, fn. 18, 23 Cal.Rptr.3d 417, 104 P.3d 783; see Sass v. California Bd. of Prison Terms (9th Cir.2006) 461 F.3d 1123, 1128-1129 [state cannot interfere with constitutionally protected liberty interest in parole without some basis in fact or in an otherwise arbitrary fashion]; McQuillion v. Duncan (9th Cir.2002) 306 F.3d 895, 902 [due process demands that "some evidence support[] the decision" by the Board to revoke or deny parole].)
[6] The majority's observation that reports explaining a parole denial by either the Board or the Governor in the cases we have reviewed on prisoners' petitions for writ of habeas corpus usually classify the murder involved as "especially atrocious, heinous or callous" does not in any way diminish the significance of that description; for one would assume that it is precisely those most grisly of crimes that warrant denial of parole. (If the Board has granted parole and the Governor has not reversed that decision, of course, we do not see a writ petition from the prisoner.) That the same language is used in those decisions reflects not rote use of hyperbole, as the majority appears to suggest, but the fact that the regulations governing the determination of parole suitability expressly provide as a circumstance tending to indicate unsuitability, "The prisoner committed the offense in an especially heinous, atrocious or cruel manner." (Cal.Code Regs., tit. 15, § 2281, subd. (c)(1).)
[7] The majority's comparative approach is markedly different from the analysis in In re Scott (2005) 133 Cal.App.4th 573, 34 Cal. Rptr.3d 905, one of the cases on which it purports to rely, in which the court found "the record contains no evidence Scott committed his offense `in an especially heinous, atrocious or cruel manner.'" (Id. at pp. 600-601, 34 Cal.Rptr.3d 905.)
[8] As phrased by the majority, the question presented by Lawrence's petition is not whether there is "`some evidence' to support the Governor's findings, but `some evidence' sufficient to satisfy the statute's ultimate test, that is, some evidence' the release of Lawrence would subject society to an `unreasonable risk' of danger to public safety." (Maj. opn., p. 561.)
[9] Although Division Eight of this court in In re Lee, supra, 143 Cal.App.4th at page 1408, 49 Cal.Rptr.3d 931, reframed the some-evidence test as whether there was evidence to support the ultimate conclusion of unsuitability rather than evidence of a specified factor relevant to the parole decision, when actually considering the Governor's decision, the court concluded there was no evidence to support the Governor's characterization of the crime as "atrocious" or "especially heinous." (See id. at pp. 1409-1412, 49 Cal.Rptr.3d 931 ["Lee's crimes were more commonplace than egregious"].)
[10] In In re Van Houten (2004) 116 Cal. App.4th 339, 10 Cal.Rptr.3d 406 the Court of Appeal noted the petitioner's offense was the equivalent of first degree murder without special circumstances justifying the death penalty or life without the possibility of parole. (Id. at p. 352, 10 Cal.Rptr.3d 406.) Applying the standards articulated in Rosenkrantz, supra, 29 Cal.4th at page 683, 128 Cal.Rptr.2d 104, 59 P.3d 174, the court reasoned that the presence of special circumstances would necessarily constitute "`particularly egregious acts beyond the minimum necessary to sustain' the conviction." (Van Houten, at p. 352, 10 Cal. Rptr.3d 406.) The court then held some evidence supports the existence of several special circumstances in Van Houten's offense and reversed the trial court's order overturning the Board's decision denying her parole. (Ibid.) Contrary to Lawrence's argument, although Van Houten holds that the presence of facts establishing special circumstances under Penal Code section 190.2, subdivision (a), demonstrates "particularly egregious acts beyond the minimum necessary" for a first degree murder conviction, nothing in that case suggests the Board or the Governor is not entitled under Rosenkrantz and Dannenberg to consider the aggravated nature of the defendant's crime or her callous disregard for the suffering of her victim, facts surrounding the murder that may not qualify as a special circumstance, in weighing the gravity of the offense as it relates to parole suitability.
[11] The Governor must conduct his review of the Board's decision within 30 days (Cal. Const., art. V, § 8, subd. (b)), affirm, modify or reverse that decision on the basis of the same factors as the Board is required to consider (ibid.) and provide the prisoner with a written statement of the reasons for his decision (Pen.Code, § 3041.2). Lawrence does not argue the Governor failed to comply with any of these procedural requirements.